Chief Justice Robertson
delivered the following Opinion of the Court in this case, on the 4th of June last. A petition for a rehearing was afterwards presented, by which the decision was suspended till this date, when the petition was overruled,
On the 22d of Janury, 1776, a warrant for two thousand acres of land, which had been procured by James Allen, under the proclamation of “63,” was surveyed “in the “ (then) county of Fincastle, on the waters of Salt Riv- “ er—beginning on a fork where the north branch is “ about ten yards wide, at two buckeyes, two sugar “ trees and a hickory, running north eight hundred poles, “ &c. &c.”
On the 8th of March, 1781, a pre-emption warrant for one thousand acres, was surveyed for Squire Boone, calling to adjoin his settlement, and to lie on both sides of Clear Creek; and a patent was issued March 10th, 1786.
On the 25th of January, 1783, a survey was made in-the name of Joseph Helm, as assignee of William Helm, on an entry on a Treasury warrant, on both sides of Clear Creek &c. &c.
On the 3d of February, 1783, Joseph Helm entered* on a military warrant, fifteen hundred acres “on the wa- “ ters of Clear Creek, adjoining Allen’s survey on the “ west, running north with his line,, th.en.ce west, then “ south, to Boone’s pre-emption, then with Helm’s line- “ north, then east to the beginning.”' On the 22d of September, 1798, a survey was made conformably with the enti’y, and a grant was issued on the 13th of May, 1799.
Helm’s survey for fifteen hundred acres interfering, to a considerable extent, with the. boundary of a patent which had been issued to Boone, on a Treasury warrant, he filed a bill in chancery, on the 2d of October,. 1819, *404 asserting a superior equity to the interference, against Jonathan Boone and Isham Talbot, who were in the possession thereof, claiming under the title of Squire Boone.
Further proceedings in the court below; decree & appeal.
A decree which cannot be enforced without further action by the Court, it is interlocutory, not final. But the parties having eiected to consider an interlocutory decree aa final, and the unsuccessful party having prayed an appeal, though jt' was after-wards abandoned: Quexe, whether "he ought to be permitted to set up any new defende ill tl\o case.
*404 The Circuit Cpurt having, at its September Term., 1821, intimated an opinion in favor of Helm, and directed a survey for effectuating that opinion, Boone and Talbot, by consent of parties, appealed. That appeal was, in December, 1822, dismissed by this Court, because the record had not been filed. But, during the pendency of the appeal, the appellants were permitted by the Circuit Court, to. file a supplemental answer exhibiting, for the first time, the patent of Squii'e Boone, and insisting that the claim of Helm had become void, in consequence of hi? failure to have his entry surveyed within the tipie, allowed for that purpose, by the law of Virginia,, in force at the date of the separation of Ken. lucky from that Commonwealth. And the Circuit Court having, at its October term, 1823, dismissed the bill, Helm prosecuted a writ of error and procured a reversal, on the ground that, whilst the case was pending in this Court on the appeal, the Circuit Court had no authority to take any cognizance of it. See 6 J. J. Marshall, 367.
After the return of the. cause to the Circuit Court, Boone and Talbot moved for leave to file a supplemental answer, relying on the defence already suggested as having been asserted during the pendency of the appeal in this Court, apd also, on the additional ground of an alleged adversary possession of an inconsiderable portion of the land, for more than twenty years antecedently to the institution of this suit. But the Circuit Court overruled the motion; and having rendered a final decree in favor, of Helm, for all the land common to the two conflicting surveys—Boope and Talbot now complain, and insist on a reversal, for several reasons, which we will proceed, briefly and successively, .to consider.
First. The appellants insist that, the Circuit Court erred in refusing to permit the supplemental answer to be filed.
Although \ye are disposed to consider the decree of *405 1821, in favor of Hplm, as interlocutory only, because it could not haye been enforced without the further action of the Court which rendered it: nevertheless, the fact, that the parties now complaining had, for their own advantage, elected to consider it final, and had after-wards, either voluntarily abandoned their appeal, or negligently lost the benefit of it, might, were it material in the present aspect of the case, be worthy of grave considera? tion in determining whether the Circuit Court ctbused its power or discretion, by deciding the case as if was presented by the record when the first appeal was granted, in 1821.
After a cause had been pending for a long time, decrees pronounced, appeals taken &c. def’ts offered amende meats to their answer, setting up two grounds' of defence, which, the court rejected; but permitted a paper to be filed presenting one of the grounds; as tu the other, (bar. by time) no excuse was shown for not relying’ upon it in duo; season: 7ieW,thal; there was no error in rejecting the proposed a-) tnendmdnt.
But, waiving this matter, we are, on other grounds, of the opinion that the Court below did not err in overruling the motion for leave to file the supplemental answer.
By permitting, as that Court did, the patent of Squire Boone to be filed, one of the points proposed by the supplement—that is, whether the Legislature of Kentucky had, consistently with the compact between Virginia and Kentucky, authority to extend the time prescribed by the laws of Virginia for surveying entries, so as to affect private rights to land which had accrued under the laws of the latter state prior to the separation— was judicially presented, and as availably as it could have been by the rejected answer. And, as to the only remaining point which the appellants attempted to raise by the rejected answer, that is, the alleged bar claimed as resulting from lapse of time and adverse occupancy— we do not doubt that, conceding to the Circuit Court plenary discretion when the supplemental answer was offered, the record is insufficient to show that there was any such abuse of sound judicial discretion, in rejecting the answer, as would authorize a reversal. The appellants did not show, or even suggest, why they had not sooner pleaded the lapse of time. They only stated that, they had recently discovered a witness by whom they could prove certain facts tending, in their opinion, to sustain such a defence. Did they not, when they filed their original answer, or before the decree of 1821 was pronounced, know whether they were entitled to, *406 protection in consequence of continued adverse possession? They have not intimated that they did not. And this Court should not presume that they did not. Why then was not this defence attempted sooner? No sufficient reason has been suggested; for, waiving other considerations, the appellants have not pretended, that the discovered witness was the only one whom they could have procured; and no Court could indulge the belief that, if the fact, of more than twenty years’ adverse possession, had existed, there was only one person living who could have proved it. Supposing the fact to exist, we should presume that the appellants had been guilty of unexplained and gross negligence in having, so long, omitted to rely on it, or attempt to prove it: and it is very questionable, whether the facts which the appellants rather vaguely disclose, as those which they could prove, yypuld be sufficient to establish the alleged partial bar.
Tfte aet(s of Üie Kentucky Legislative extending tlie time for malting surveys upon Virginia entries, are not inconsistent with the compact between tho two states.
We are, therefore, of the opinion that there was no error in the rejection of the supplemental answer.
Second. The next objection which has been made to the decree, is that, so far as the title of Squire Boone was concerned, Helm’s survey, in 1798, was void, and the claim founded upon it, therefore, invalid; because, as argued, to that extent, the attempt, by the Legislature of Kentucky, to extend the time for making surveys of Virginia, entries, was inconsistent with that portion of the compact between the two states, which stipulated that, “all the private rights and interests of “ land within the said district (Kentucky) derived from “ the laws of Virginia prior to such separation, shall re- “ main valid and secure, under the laws of the proposed state, and shall be determined by the laws now existing in “ this; state” (Virginia.)
The important question thus presented, has never been settled by this Court, or by any other authoritative tribunal, so far as we know or believe.
In Hoy’s Heirs v. McMurry et al. 1 Litt. Rep. 365, this Court expressed an opinion coincident with the argument now made by the appellants. But, on re-considerqtion, the case being decided on another point, that opin *407 ion was revoked, “without either affirming or denying its correctness.”
In McCracken's Heirs v. Beall and Bowman, (3 Mar. 209,) this Court decided that an entry, survey and patent in the name of a dead man, prior to the separation of this state from Virginia, were void; and that the statute of 1792$ of this state, for vesting the title, in such a case, in the heirs of the grantee, should not be construed as retro-acting, consistently with the Compact, so as to affect an adversary right to the same land which had been perfected prior to the separation, and which, therefore, at that time, was, according to the laws then in force, unaffected by the claim in the name of the dead man.
And in Beard v. Smith (6 Mon. 430,) although the point, we are now about to consider, was extensively discus* sed by the only two Judges who adjudicated in that case, yet it was not decided—Chief Justice Bibb arguing, most elaborately, to prove that the legislative prolonga* tion, by Kentucky, of the time of'surveying Virginia entries, was not, in any respect, incompatible- with the compact; and Judge Mills reasoning, in extenso, to show? chiefly, that the question was not raised, and that, therefore, a decision of it would be premature and extraju* dicial.
These are the only cases, now recollected, in which the vexed question, now to be decided, has been directly and judicially considered by this Court.
It seems to us that, whether the letter or the spirit of* the foregoing stipulation in the compact, or the language or the motives of the parties to it, be properly consider* ed, the more rational, just, and consistent conclusion must be, that, so far as claimants to land, within the lim* its of the state about to be established, who had acquired rights, whether perfect or imperfect, under the laws of Virginia, and with confidence in the stability and integrity of those laws, might be concerned, Kentucky should, in good faith, acknowledge all rights thus acquired, and, representing Virginia in maintaining and effectuating the legal system which had been adopted by that parent state, should not, of course, destroy or invalidate, *408 bht should protect, and, when expedient and just, perfect ALL such rights to land within her ceded borders. The language of the compact imports no more, and none of its presumed objects could have required or justified more. “Private rights, &cs shall remain valid and secure “ under the laws of the proposed state, arid shall be de- “ termined by the laws now existing in this state.” All these expressions, taken together, mean, even according to their literal import, this and only this: that, as to the Validity and effect of such claims to land as then existed under the Virginia land system for the district of Kentucky, the rights of the claimants, as then existing, whether perfect or inchoate^ should be tested by the laws under which they had been acquired, and that Kentucky should not abolish those laws, or enact and enforce any statute destructive of the validity of such of those claims as Were, according to the laws existing when they were acquired, valid and available. Then if any such claimant had a good entry, it—that is, the entry, should ever remain good, as a valid and legal location. If he had a survey, good according to the law under which it was made, if—that is, the survey, should continue to be held as having been, when made, legal and valid. If he had obtained a patent, if—^that is, the patent, should bo deemed, in the courts of Kentucky, to have vested in the pa„ ten tee all the rights which were guarantied by the laws of Virginia existing when it was issued. And if, at the time of the separation, one claimant had a perfect, and another an imperfect title, to the same land, each, according to its degree, valid and legal, both shall over be held.* in the like manner, to have been then good, and neither of them shall ever be invalidated by Kentucky. This seems to us to be the utmost latitude of the literal and intrinsic meaning of the compact. And it does not interdict prospective legislation by Kentucky, for perfecting any imperfect title which was good, in its degree, at the date of the compact, or of the separation, or for maintaining her own just authority as a sovereign, in procuring revenue, giving proper repose to honest occupants, preventing vexatious litigation, or in enacting and upholding, prospectively, any other just system of *409 'public economy, Which Virginia herself might have adopted, without rendering, by retro-action, that invalid tvhich was valid under her laws. It is admitted in argufnent, and could not be plausibly denied, that prospective limitation .and revenue laws, by Kentucky, affectIng rights to land acquired from Virginia, are not interdicted by the compact. And it is also, very properly, ’conceded that, the compact cannot be so construed as to deprive Kentucky of the power of prolonging the time for surveying Virginia entries, so as to prevent a forfeiture of them to herself. But it is insisted that, nó such prolongation can be effectual, if there be any other ■claimant of thé same latid, under ihé laws of Virginia-, and whose survey was made, or whose title was perfected, according to the laws of Virginia, as existing at the date of the' compact.
We are not able to perceive any sufficient ground for any such discrimination. By saving the right of A, Kentucky does not invalidate' that of B-. If B’s right were good, no indulgence extended to A, can have made it bad; and if it were not valid, he cannot complain of any injustice to himself in the legislative-indulgence to A; because, if A’s inceptive fight had become void, his own title could not thereby have been made good, and Kentucky would have an undoubted power to appropriate the land to her own use. Nor, if B’s right, though good. Were posterior ill its origin, or inferior in merit; to that of A, and would, therefore, hold the land in the event of A’s becoming afterwards void, would lie have any just cause to complain of Kentucky, for not permitting the law to expire which would save A’s right from forfeiture; for, still, B’s right would “remain” as “secure” and “valid” as it was at the date of the compact, and its validity must still be tested by the laws in force at that time, or at the time of the separation; and he would have no more reason for excepting to the act of indulgence to A, than he would have had to an act extending the time which, at the date of the separation—he then being in the adverse possession of the land—was ■prescribed by the laws of Virginia for bringing suits for land; because, if he had aright to expect that his *410 posterior claim would prevail on the contingency of A’s failure to make his survey within the time prescribed by the laws of Virginia, he would have had just as much tight to expect a result equally beneficial to himself in the event of A’s failing to sue him within the time pres* cribed by the law of Virginia. But in the latter hypo* thetical case, it must be admitted, that a prolongation of the time for suing would not have invalidated B’s right* or divested him of any vested right, and consequently could not be deemed repugnant to the compact. Still JB's right, precisely as it existed at the date of the com* pact, and was thereby guarantied, would remain as secure and valid as it then was, and still, too, that right would be determined by the laws of Virginia, which gave it all its vitality and validity. The same may, with equal propriety and effect, be said of the other'hypothetical case. In each case, if the legislative extension of time occurred before the right of A had been lost, B had no vested right, of the divesture of which he could com* plain.
But this interpretation of the compact is fortified by a proper consideration of the policy and objects of the parties to it.
Virginia, about to yield her sovereign dominion over a portion of her territory in which many persons had, for a valuable consideration received by her,- acquired interests according to her laws, thought fit to exact from her successor a pledge, that those rights should con* tinue to be regarded according to those laws, and that, taking the territory, as the ceding sovereign held it, subject to all just private claims, Kentucky should not appropriated*) her own use, or convert to her own profit, any land which had been appropriated conformably with the laws then existing, and that those private interests should be adjudged according to the laws which vested them. The stipulation, made to effect that ob* ject, was precautionary and just, and was intendedonly to guaranty, by treaty, that "which, in the nature of things, was morally and politically right; and that is, that the new sovereign should take the territory, voluntarily ceded, just as the ceding, sovereign held it, and *411 ■subject to all the same private claims of legal or equitable interest in it. To that extent the faith of Virginia was pledged to those who had bought her lands; and, to the same extent, precisely, she required the faith of Kentucky to be likewise pledged, by a solemn compact. She had no motive for impairing the just sovereignty of Kentucky, or for restricting her national power, to any gi’eater extent or for any other purpose; nor could Kentucky have had any adequate motive for incurring any other obligation than that of reason and justice. Security of justice to ALL Virginia claimants of land, within the bounds of Kentucky, was the mutual and only object of each of the contracting parties. After Kentucky obtained the sole dominion over the territory, it was intended only that she should exercise it as Virginia had done, and might still have done, consistently with justice and constitutional propriety, had she retained it. Virginia had, for reasons satisfactory to herself, prescribed a limitation to the time of making surveys; she had, for reasons alike satisfactory and consistent, prolonged, from time to time, that limitation, and after the date of the compact, that is in November, 1790, she enacted a statute for continuing the prolongation, two years more-, and that term did not expire until after Kentucky, following her example and for effectuating her policy, which, doubtless, she would have persisted in,—had passed a statute for further indulgence, which -was extended, by successive enactments, to the last of September, 1798; before which ultimate period, Helm’s survey was made.
Thus it is evident that Virginia had not deemed the time of surveying to be essential, and was not disposed to limit it immutably. And it is equally evident, not only from her own practice, but from the nature and object of such a limitation, that she could have had no motive for exacting from Kentucky a pledge, that she would allow no further time for perfecting the very titles, the security of which was one of the objects of the compact. Jls Vim ginia had not considered such, indulgences incompatible with the rights of conflicting claimants, it should not be presumed that she was unwilling that her own policy should b§ observed by Kentucky in the continued grant o.f similar *412 indulgence. Her jealousy might have dictated a stipu? lation that Kentucky should not refuse such indulgence, but she could have no motive, of interest, of fear, or of obligation to claimants under her laws, for denying to. Kentucky all proper and accustomed means of effectuating the rights and the policy which had been initiated by herself. And we are unwilling to admit that Ken-, tucky holds dominion otherwise than Virginia did; op may not do what Virginia could have done, and persisted to the last in doing, without impairing the obligation of any contract, breaking any faith, or violating any private right. Kentucky has, in our judgment, absolute dominion over the whole territory within her jurisdictional limits, subject only to the qualification that she must respect all valid private, rights and interests, which had been perfected or initiated under the laws of Virginia, prior to the separation, or which have been so. acquired since, under her own laws. The compact did not pro. vide, and could not have intended, that all the laws of Virginia respecting the time and manner of perfecting titles in Kentucky, should be inflexible and immutable. Such a provision would have been as irreconcilable with the object of Virginia, as it would have been with the just sovereignty of Kentucky. Virginia might have apprehended that Kentucky might not perfect such titles as were, still imperfect at the time of the separation, or would not allow reasonable time for the consummation of them; but she never could have feared that idulgence would be given, and certainly could not have been unwilling that it should be. Why should Virginia have been solicitous that her successor should not follow her maternal example, but should, willing or unwilling, repudiate her indulgent policy, and act the cold and scowling stepmother? Why c.ould she have been desirous, that good and meritorious claims, derived from herself for a valuable considepation, should be forfeited to Kentucky, or to conflicting claimants whose rights were posterior in origin or inferior in quality or merit? Her solicitude was, as we would presume, rather for the prior and the better private- right, which she was bound, b.y all the obligations of honor and faith, to secure by all *413 possible and proper guarantees. As she did not tax unpatented lands, her chief, and perhaps her only motive, for prescribing any limitation to the time of surveying entries, was to hasten the augmentation of her own revenue and the completion of a job. The interest of hoiders of inferior equities was npt one of her motives. The limitation was not one of their vested rights¡ and, of pourse, the law, prescribing the limitation, was not one of the laws from which their rights or interests had been, derived; and there having been no guarantee, express or implied, that the limitation should never be prolonged, •its prolongation by Virginia, was perfectly consistent with her integrity and good faith, and with the private .rights and interests of all claimants, under her laws, to Kentucky lands, No such claimant had any right to insist or to. expect that the limitation would never be prolonged; and therefore, its continued elongation, by successive enactments prior to the separation, was no wrong to him, and was altogether compatible with any and every right vested in him, in law or in equity. Nor had he any such legal interest in the immutability of the limitation as to. give him authority to insist that Kentucky, consulting personal justice "or public policy, or. even a disinterested magnanimity, should not exercise-a sound and provident discretion, ás to the tim%, as well as the manner, of perfecting inchoate Virginia titles, and especially such as were superior in equity to his own. In consummating what Virginia, having only begun, had devolved on her the duty of finishing, Kentucky was -not limited in the means adapted to the end, as long as^ she refrained from doing any’ thing to render insecure, or to invalidate any Virginia claim which wras secure, and valid at the date of the separation, or to make any such claim less valid or less secure thap Virginia hac[ done, and might have continued to do, without any violation of faith, of justice, or of law.
Kentucky, taking the place of Virginia, succeeded to all the. same rights and sovereign power, and was free under the compact to do, in a spirit of justice, what Virginia, in the like spirit, had done and might, without *414 question, have continued to do, had she never surrender» ed her power.
Whilst surrendering her sovereignty to Kentucky, Virginia did not intend to maim or curtail it farther than by exacting a pledge that it should, as far as Virginia land’ titles might be concerned, be subjected to the paramount obligations of public faith and of justice to private rights. Any other interpretation of the compact would not only be inconsistent with its ends and motives, but would tend to the gratuitous disfranchisement and degradation of Kentucky.
And, what is a private right to land? and, what is justice to such a private right? The right is that which had been acquired under the sanction of law, and which, therefore, is entitled to the protection of law. But, surely, it is no part of that right, or of the security which it may demand, as essential to its existence or validity, that a time which had been prescribed for perfecting all imperfect rights, should never be extended. And it is perfect justice to the right itself,-to permit it to be enjoyed according to its nature, and to sustain its validity. No statute for prolonging the time for surveying entines, ever, in the slightest degree, impaired any right or title to land; and notwithstanding such indulgences, every claim to land is, in itself, as valid as it would have been had there been no indulgence;- and its validity will be tested by the laws under the authority of which it was acquired. Whether a rival claim be valid, or invalid, superior or inferior, is another question altogether. If a. good elder entry become void or be forfeited, a junior qntry might then become available; and the value of the latter entry would depend, prior to the extinguishment of its superior, on the possibility that the holder of it might, negligently or otherwise, permit it to be extinguished. Such a contingency can vest no right until after it shall have occurred; and without its occurrence, the inferior claim can give no right against the only true owner of the land. If the true owner should forfeit his right, another claimant may thereby acquire an available interest; so may amy other person, if the land should be.com.e vacant.
*415 And the only difference between the holder of the inferior claim, and others who have no claim, is that he may first occupy the place of the owner who had forfeited his right. And can it be possible that such a chance of accidental advantage can be deemed a right to land, or an interest in land, and that it has been guaran* tied by treaty?
Although the Supreme Court of the United States has not conclusively settled this question, yet it has given very strong intimations of what its opinion is. In. Miller's Heirs v. McIntire, 11 Wheat. 442, the Chief Justice observed, that some of the Judges were of the opinion that there could be but one appropriation of the same land, and that a “second entry” was unauthorized, and that a patent founded on it would be_ void; but that others" of the Court were of the opinion that, “a subsequent entry was hot absolutely-void;” but that they thought, also, that the “possibility” of its becoming good, “ could not attach itself absolutely to the land, until it “ became vacant;” that—“till such vacancy actually oc- “ curred, the power remained with the state to give fur- “ ther time for perfecting titles; and that, the state, “ therefore, might grant indulgences in this respect, with- “ out giving just cause of complaint to a person whose “ interest, if he had any, was potential, not vested, was “ rather a preemption, to the exclusion of others sub* “ sequent to himself, than a positive acquisition which “ could in any manner interfere with the rights of the “ person who had made a previous appropriation.’-’
And this may, we think, be fairly,inferred to have been the opinion of all the Judges, in that case; And is it not plainly reasonable?
, What right has any one “to inier/ere” with the rights of the first or best appropriator, as long as those rights remain? and who, but the Slate, can say when, or whether at all, they shall be forfeited?
In Kendall v. Slaughter, (1 Marshall, 378,) this Court expressed, arguendo, the same opinion as that intimated from the National Bench. But neither of these appellate tribunals having expressly decided the question, we have referred to these cases as argument, not as author-
Jo. Helm’sen try •—of 1500 acres, “on the waters of Clear creek, adjoining Allen’s survey on the west, running north with his line, then west, then south, to Boone’spreemption, then, with Helm’s line, north, then east, to thfiheginning” id entry. iMar$ —was formerly held to be a val-
*416 ity; And we are satisfied that the doctrine intimated in the case of Miller's Heirs v; Mclntire, is the true doctrine.
Had a forfeiture ever bééri permitted to Occur, their holders of unforfeited claims would have had vested rights by operation of law, and, so far as they might have been concerned, a subsequent prolongation of the time of surveying might have been ineffectual; and this is the only principle of the doctrine which has been referred to as having been settled in the case of Me Crack-en's Heirs v. Beal fyc. 3 Marshall.
The fact, that Boone had obtained a grant prior to thé separation, is not deemed material; for nevertheless, Helm, still being the true owner in equity, had a right to have his title perfected by Kentucky after-the sepa¿ ration; and Kentucky had a right to continué the unexpired indulgence as to the time of surveying the entry.
It is, therefore, our opinion that, lio hdlder of a claim, inferior in either equity Or law, has any right to object to the legislative extension of the time for surveying all Virginia entries, or to insist that there was any guarantee that a limitation, once prescribed, should never be enlarged; If Kentucky had no power to continue the limitation, she would have had no power to prescribe &nv limitation, in all time, had there been none at the time of the separation: and the absurdity of such a conclusion.must be universally felt and acknowledged; Public policy alone dictated, and such policy alone should control, all such limitations.
Wherefore, we are of the opinion that Helm’s entry was not forfeited.
Third. The only remaining principal objection to the decree is, that the entry is uncertain, vague and invalid; This Court, in the case of Withers et ux. vs. Helm (1 Mar. 145,) decided, that this same entry was valid; and the evidence in that case, and in this, was substantially the same. In each case, the notoriety of Allen’s survey, and of Boone’s pre-emption, at Boone’s station, on his settlement adjoining his pre-emption, and at the date of Helm’s entry, is established by several witnesses. In this case, however, a fact appears which was not shown *417 itl that of Withers vs. Helm; and that is, that, in the fall of the year 1781-, Boone’s Station was “broken up’’.by the Indians, and was not re-occupied until the fall'of 1783, after the date of Helm’s entry”. And frotó 'this circumstance the counsel for the appellants argue that, the proof of notoriety among those who were at Boone’s Station, is insufficient to establish notoriety elsewhere, in the winter of the year 1783', when Helm’s entry was made.
was proof in that case, as ofulc notoriety] ait Boone’s Sta-the^nuy^onhe objects called for. ther p,.00p no5V> that tlie statioa was broken up in 1781, &remain-fed uninhabited for2yeais,during which Helm’s BuwS "that' as the inhabitants Ih^ne^híoring forts, the breaktíon" woullTren* der it rather easdifficult]1" for"a subsequent locator, by inquiry, to find the ob-.^n°theenV,^-md locate theadja- and^o^he'entry is not the less J^tfo^wa^uninhabited.
The calls in the above entry—though apparently vague aiid uncertain, held to be sufficiently precise and explicit (with the exception below) inasmuch as the surveys which it calls to adjoin would enable subsequent locators to ascertain its true position.
.One part of the entry, however, viz: “then south to B’s preemption, then with H’s line north',", is absurd; perhaps because of the accidental omission of a call between the line south and the line north—an omission which no one can supply: in this respect, and thus far, therefore, the entry is uncertain and invalid. But that incongruity will not affect the validity of the entry as to any land lying between Allen’s survey, on the east, W. Helm’s, on the south, and a line running north from his north-west corner; and so far the entry is good. The entry should be surveyed—beginning where the appelee’s survey begins, in Allen’s line, and running with that line, north, so far as to include 1500 acres in a rectangular figure, as near square as may be consistent with a call for Boone and W. Helm.
But,as the occupants of Boone’s station, in 1781, took refuge in the neighboring forts, we should presume that a subsequent locator, by enquiring at any of those places, in 1783, after the date of Helm’s entry, might have ascertained the position and identity of Allen’s survey and of Boone’s settlement, on the waters of Clear creek. mi r , , , • • i i i ,,i , ,, ihe very iact that the station had been “broken up, would tend to give it notoriety, and that alone would - . , , , . , , V . I I II • iurmsh a clue which, when applied to the other calls m the entry, would have identified it.
Boone’s settlement and Allen’s survey having béeñ, or being presumed to have been, notorious, and subsequent locators being sufficiently notified, by the calls in Helm’s entry, that his fifteen hundred acres must lie between Allen, on the east, and Boone, on the south, and was also bounded by W. Helm’s survey on two lines succeeding that which terminated in Boone’s north line, the apparent -I . . . , ,1 . lie vagueness of the entry, m its indefinite calls lor courses and general objects, without specification as to precise locality or distance, will be found, upon proper scrutiny^ not to exist, except as to a comparatively small portion of the land in controversy in this suit. The only difficulty which might have perplexed a subsequent locator, *418 knowing the position of Boone and of Allen, and finding, as he might easily have done, William Helm, would have arisen from the fact that, after running south to Boone’s line, the next call is “thence with William Helm’s line north”—although Helm’s line is precisely the reversed course of the line , running to Boone’s line—the entry calling to run south, to Boone’s line, and there, without any intermediate call, north, with Helm; but this apparent incongruity could not affect the validity of the entry as to any of the land lying between Allen’s survey, on the east, W. Helm’s survey, on the south, and a line running north from his northwest, comer* And to that extent, we do not doubt the validity of the entry. As the survey and patent of the appellee include ail the land thus designated, and the appellants have not established the superiority or validity of the entry under which they claim, we can perceive no objection to the decree of the Circuit Court, as to so much of the land in controversy as is included within the boundary just described; and so far, we would concur with the opinion in first Mar. shall, although, as it was founded on facts, and was a decision between other parties, it is not conclusive in this case.
But, as to the residue of the survey, not embraced by the entry, as established by the concurrent opinions of Pur predecessors and ourselves, we feel unable, after the most anxious and scrutinizing deliberation, to sustain it as conformable with an entry certain and intelligible in any reasonable degree.
Before a subsequent locator could be expected, by ordinary diligence, to identify any one line or corner of the appellee’s boundary, it would have been indispensable for him to find and identify William Helm’s survey; this be might easily have done, without any other informa, tion than that furnished by the calls of the appellee’s entry, and by the marks made by the surveyor. He would have rightly inferred, from the appellee’s entry, that William Heim’s survey adjoined Boone’s survey on the north, and was west of Allen’s survey. Then, with this clue, he would have traced Boone’s line, until he came to one of William Helm’s corners, upon or near it, and one *419 of his lines leading north from it; and, by then tracing the fresh and visible marks, he would have had no difficulty in identifying the survey; because it does not appear, that there was any other actual survey which could have occasioned any perplexity or doubt. And, after thus identifying William Helm’s survey, knowing, as must be presumed, that the appellee’s claim was to be bounded on the west by a line running, from Boone’s settlement, north with W. Helm’s survey, and was to ad-, join Allen on the west, and to contain, in a rectangular-' figure, as prescribed by his entry, fifteen hundred acres, his only difficulty would have resulted from the spontaneous and unavoidable enquiry—why did the entry call to run south to Boone's line, and thence north with W. Helm's line, instead of calling for—what would inelude, precisely the same land—William Helm’s northwestern-corner? And, not only would this enquiry necessarily have suggested doubts as to the meaning of that anomalous call in. the entry, but those doubts would have been-rendered more perplexing by the fact, that the line, with which the entry calls to run from Boone’s line, begins not far from Boone’s northwestern corne'r. With these facts, it would have been difficult, if not impossible, for the-enquirer to have determined, whether the appellee inten-. ded to run with William Helm’s line, south to Boone’s line,, and then back on the same line, north, and then to the-beginning; or whether he intended- to run-^-as his surveyor did afterwards run for- him-—south to Boone's JVV W. corner, (even, though he did not call for so eligible- and conspicuous an object, but called- only for Boone’s Zine,) and thence—as his surveyor ran—with Boone's line,. to William Helm’s corner in it;- and thence, with W. Helm’s line, north &c.; or whether he intended to strike Boone’s line at some intermediate point, and if so, whaU point; and he could not have- adopted either of the latter conclusions, without presuming that an intermediate, call, to run to W. Helm’s line, had been inadvertently omitted in making the entry.. Now, without amplifying on this perplexing subject, it must, we think, be seen and acknowledged at once, that the entry furnishes no clue for relieving the mind from the uncertainty which?i *420 in this point, confuses it, and which is increased, rather than diminished, by scrutiny and reflection. All that can be ascertained with reasonable certainty, is .that William Helm’s line is to, be one line of the fifteen hundred acres, And, therefore, whatever might be the more rational and consistent deduction as to the locator’s intention—and we are disposed to think, that there is one rather; more so, than others—we feel impelled to the. conclusion that, in the particular we have just been considering, the pntry is altogether too vague and uncertain to prevail, as far as this defect operates, over the elder-legal title. And this conclusion has been so difficult to resist, as to overrule, the opposing deduction of the Court, in the case in first Marshall; and especially as we infer that this matter was not considered in that case, because it was not there, material, and because |t is not specially noticed in the opinion as published.
■ It is our opinion, then, that the entry should be deemed certain and valid, to the extent of a survey beginning where the appellee’s survey begins, in Allen’s line, and running with that line, so far north, as to include fifteen hundred acres, in a rectangular figure, approximating as nearly a square as may be consistent with the. call for Boone and William Helm; and that so far as the survey of the appellee- has departed from the figure thus described, it is variant from the entry—having one more line and course, and being, so far as these modify its shape, altogether unlike any kind of quadrangular figure.
Consequently, the decree of the Circuit Court is deemed erroneous, only so far as it directs a relinquishment pf the, legal title to such of the land in contest, as will not be embraced by a line running south to W. Helm’s-northwestern corner.
The only conceivable reason why the locator called to run south to Boone’s line, and then north with William Helm, without any other call, is, either that he did not know the exact relative position of those surveys, or that he omitted, thi-ough mistake, one of the calls which he contemplated.
*421 But whatever the reason was, a subsequent locator could not be presumed to know it, and had he understood that there was mistake or ignorance, and that the locator did not intend to run with William Helm’s line, immediately from the point where he first struck Boone’s line, still he could pot have ascertained the point where the line running south to Boone’s line was intended to terminate, nor how or where William Helm’s line was to be reached. No fact furnished any sufficient index, and no rule of legal construction would have designated Boone’s corner as the point of contact with his line, especially as the line, and not the corner, was the object designated by the entry, and every other point, excepting that at which W. Helm’s line commenced, was equally uncertain and indefinite. And consequently, as a subsequent locator could not have known where the line running south to Boone’s line would strike the latter, and as he copld only have known, with reasonable certainty, that W. Helm’s line was one of the boundaries of the fifteen hundred acres, he, had notice that the l^and, to a certain and ascertainable extent, on the north of W. Helm, and west of Allen, was included in the entry, but had no notice whether any, or if any, how muph land west of William Helm’s western boundary had been appropriated, And therefore, we conclude, that the entry and survey of the appellee, are sufficient to entitle him to a decree to the greater portion of the land involved in this suit; but that they are insufficient to any greater extent than that already defined. Respecting the validity of the entry, as far as we have here éstablished it, we have full confidence. The only possible doubt which could arise on this point, is as to the beginning in Allen’s line; but after running, with W. Helm, north, and then east, with his line also, as the whole entry clearly shows to have been the locator’s intention, the beginning in Allen’s line is fixed, and then one side of a rectangular parallelogram, described by the entry, will be given. And we feel equal confidence in the opinion we have expressed, as to the invalidity of the entry to any greater extent than that which we have defined.
*422 Wherefore this Court decrees and orders, that the decree of the Circuit Court be reversed, and the cause remanded, with instructions to ascertain the quantity and boundary of the land common to the patent boundaries of the appellant’s and the appellee’s survey, as modified by the foregoing opinion, by making a line north from William Helm’s northwest corner, the western boundary; and then to decree in favor of the appellee, all the land thus included.