Spring Term
1839.

8d 15
95 229

## Rollins *et al. vs.* Clark.

EJECTMENT.

[Mr. J. T. Morehead and Mr. Cates for appellants: Mr. Owsley for appellee.]

FROM THE GENERAL COURT.

Chief Justice ROBERTSON delivered the opinion of the Court.

*April* 19.

THIS appeal brings up for revision a judgment in eject- ment, obtained by *William Clark* against *James Rollins* and *John Wilson,* for eviction from a tract of land west of the *Tennessee* river, in this State, and which was conveyed to the said *William* in the year 1803, by *General George Rogers Clark,* to whom thirty six thousand nine hundred and sixty two acres, lying on the rivers Ohio and Tennessee, had been granted, by this Commonwealth, in the year 1795, in virtue of a certificate of survey, made June the 7th, 1784, on an entry made May the 18th, 1780, on treasury warrants issued by *Virginia.*

Title of the pl'tf, now appellee.

Though the appellants exhibited no title, they resisted the recovery in the General Court, on two grounds:— *First*—that the evidence was insufficient to prove that the patent to *George Rogers Clark,* and his conveyance to the appellee, included the land sued for; and, *second*— that the patent is void, because, as urged in that Court, and zealously reiterated in this, no land west of the *Tennessee* was subject to appropriation by a treasury warrant, at the date of either the entry or survey of *G. R. Clark,* and that the Register had no authority to issue the grant on a certificate of the survey of a location upon land not subject by any law to appropriation by Treasury warrant.

The grounds on which the defts, now appellants, rely to defeat the action; and questions presented.

These two propositions present the only points to be considered by this Court, on the record before it.

*First.* Although the appellee's deed embraces much land not included in the patent for thirty six thousand ranty "the land deeded to L. H. and H. I. &c.": *held* that these terms do not necessarily and as matter of law, import that *the grantor* had previously conveyed the land referred to in the exception, or that the deed did not pass to the grantee a perfect legal title to all the land within the boundary described in the deed. Had it not passed the whole, a pl'tf claiming under it, would have been bound to show that the land sued for was not within the exception.

In a deed for a large tract of land, the grantor excepts from war

nine hundred and sixty two acres, which is the only one exhibited—yet there was sufficient proof, on the trial, that the appellants were, at the commencement of this suit, settled within the boundary of that patent, and that all the land covered by it is included in the deed.

But the deed, though purporting to convey the legal title to seventy three thousand nine hundred and sixty two acres, excepts from warranty *"that part deeded to Levi Hollingsworth and Harry Innis &c."* And the question here presented, is whether this exception imports, necessarily and as a matter of law, that *George Rogers Clark* had made a prior conveyance to *Innis* and others, of a part of the land thus afterwards conveyed by him to the appellee; and also, that this first conveyance was valid and subsisting at the date of the deed to the appellee; for if all this be the necessary deduction of law from the exception as quoted, then, as the deed to the appellee would, upon that hypothesis, show that he had not acquired the legal title to all the land embraced by his deed, it was incumbent on him to prove that the conveyance to *Innis* and others, does not include the land in controversy in this suit.

But it is our opinion that "the land *deeded*" does not, as a matter of law, import either that *George Rogers Clark* had made the deed, or that he did not pass to the appellee a perfect legal title to all the land embraced by the boundary of the conveyance of 1803.

And therefore the Circuit Judge did not err in refusing to *nonsuit* the appellee, upon the ground of that exception alone.

Nor can the verdict be disturbed for any alleged defect in the proof; because the record does not purport to exhibit all the evidence heard by the jury.

*Second.* Three questions are involved in the second proposition:—1. Was the land west of the *Tennessee* subject to appropriation by treasury warrants, in May, 1780? 2. Even if it was then so appropriable, was the subsequent survey of 1784 illegal and void? And, 3. If either the entry or the survey was void, should the patent, issued thereon in 1795, be also deemed void?

If, at the date of the location, there was no law author-

Verdict can't be set aside here for defect of proof, when the record does not contain all the evidence. Questions involved in the enquiry whether a patent for land west of the Tennessee river, granted to G. R. Clark, in 1795, upon an entry made, on treasury warrants, in 1780, and surveyed in 1784, is void or valid. And—

izing such appropriation upon a treasury warrant west of the *Tennessee*, or if, admitting that this territory was then legally subject to be thus appropriated, the survey in 1784 was prohibited by any then subsisting and valid law, then, as these facts would be historic and judicially known, the patent (*showing on its face that it is for land west of the Tennessee*) might, perhaps, be, in this case, declared void, unless the Legislature of Kentucky had, by some valid act, authorized the Register to issue it.

The first and second of the three questions last suggested, will be considered together, as one comprehensive proposition, a correct solution of which will depend on the legislative acts of *Virginia* prior to the separation of Kentucky, and upon local history and Indian treaties.

The memorable statute of 1779, enacted by *Virginia*, for raising revenue, providing for revolutionary officers and soldiers, and encouraging emigration to this western world, authorized, among other things, the appropriation by treasury warrants, of *all the vacant* lands within the chartered limits of that Commonwealth, under the following restriction, to wit: " no entry or location of land " shall be admitted within the country and limits of the " *Cherokee Indians*, or on the north-west side of the *Ohio* " river, or on the lands reserved by act of assembly for " any particular nation or tribe of *Indians*, or on the " lands granted by law to *Richard Henderson* and compa- " ny, or in that tract of country reserved by resolution" (of 1778) " of the General Assembly for the benefit of " the troops serving in the present war, and bounded by " the *Green* river, and south-east course from the head " thereof to the Cumberland mountains, with said moun- " tains to the *Carolina* line, with the *Carolina* line to the " *Cherokee* or *Tennessee* river, with the said river to the " *Ohio* river, and with the *Ohio* to the said *Green* river— " until the further order of the General Assembly."

The district thus reserved for military appropriation, having been ascertained by the running of Walker's line, in 1780, to be more circumscribed than it had been supposed to be at the date of the act of 1779, the Legislature of *Virginia*, therefore, made the following enactment, in the year 1781: to wit. "that all that tract of land in-

VIII. 3

Spring Term 1839.

*Rollins et al.* vs *Clark.*

*Held* that, in 1780, when this entry was made, no statute had been enacted, reserving the lands west of the Ten. from appropriation under the Virginia act, of 1779, authorizing the appropriation of all the vacant lands within the chartered limits of that State, with certain restrictions; that an inchoate title having been acquired by the entry in 1780, it was not illegal to have it surveyed in 1784, tho' in the mean time, acts had passed reserving those lands for the officers and soldiers of the Va. state line and navy; and that the patent, issued up on that entry and survey, in 1795, was valid, & vested the legal title in the patentee, subject only to the right of occupancy conceded to the Choctaws, by the treaty of '86; and the extinguishment of the Choctaw title, in 1818, made the title under the patent, complete.

" cluded within the rivers *Mississippi, Ohio,* and *Tennessee,* "and the *Carolina* boundary line, shall be and the same " is hereby substituted in lieu of such lands, so fallen in- " to the State of *North Carolina,* to be in the same man- " ner subject to be claimed by the said officers and sol- " diers."

Having, by an act of 1781, prescribed a mode of ap-propriating land for military services, which might lead to unjust discriminations, to the prejudice of such officers and soldiers as might not be as fortunate in their destiny as some others—the Legislature passed an act, in 1782, declaring that, " no surveyor shall be permitted to receive " any *location* upon any warrant for lands within the " country reserved for the officers and soldiers, until the " apportionment and draught for the same as directed by " the act (1781) entitled an act to adjust and regulate the " pay and accounts of the officers and soldiers of the *Vir-* "*ginia* line on continental establishment, and also of the " officers, soldiers, sailors, and marines, in service of this " State (Virginia) and for other purposes."

So far as legislative acts can affect the point we are considering, the foregoing extracts furnish all that is es-sential in this case. And these enactments authorize the conclusion, first—that, if *Clark's* location was authoriz-ed by the act of 1779, the survey, in 1784, of that loca-tion, was neither prohibited by the act of 1782, nor ren-dered void by that of 1781, *supra;* and, second—that as the land on which the entry was made, was within the limits of *Virginia,* his location, in 1780, was author-ized by the act of 1779, unless the territory west of the *Tennessee,* was embraced by the exception of "the *Chero-kee country,*" or that of " the lands reserved by act of as-" sembly for any *particular* nation or tribe of Indians;" for that territory is obviously not touched, either by the ex-ception of Henderson's grant near the mouth of Green river, or by the reservation of the military district south of *Green* river and *east* of the *Tennessee* river, as made by the resolution of 1778, and recognized and excepted from appropriation, under treasury warrants, by the act of 1779.

Upon the first of these questions, as just stated, we cannot doubt. The act of 1782 did not prohibit surveys upon "*locations*" made prior to the date of the act. A location is well adjudged, and has ever been understood to be, an appropriation of land by only making an entry on the record of the proper surveyor, containing a characteristic description of the land, for the purpose of giving locality and identity to a floating right to select and appropriate a prescribed number of acres out of any vacant land made subject to such appropriation. And such a location alone, when made according to law, vests an inchoate legal right. The only object of a subsequent survey is to afford visible and permanent evidence, on the land itself, of the extent and boundary of the tract, appropriated by previous *entry* or *location*. And a patent only confirms the location and passes a perfect legal title. The act of 1782 prohibited, or rather suspended, future "locations" only. Clark's location, made in 1780, was therefore not affected by that enactment.

Nor was it affected by the act of 1781, setting apart the territory west of the Tennessee for appropriation by the officers and soldiers. That enactment did not, either divest *Virginia* of the legal title to the land reserved, or annul any prior vested right. The only object of it was to assure the officers and soldiers that good land, sufficient in quantity to satisfy all of them, should be reserved for appropriation by them, whenever they might be prepared to locate their respective warrants. And this interpretation,—which is the only one we consider allowable—is fortified by the compact between Virginia and Kentucky when the latter was about to become a separate State.

The tenth article of that fundamental agreement expressly conceded to Kentucky the absolute property in all *unlocated* lands, within its jurisdictional limits, to be unaffected, after May, 1792, by the Virginia reservations for the benefit of the officers and soldiers—many of whom, entitled to lands in the reserved districts, had then made no locations any where, and very few of whom had made, or been suffered to make, locations west of the *Tennessee*.

Spring Term 1839.

Rollins et al.
vs
Clark.

The act of '82, which, among other things, prohibited locations within the country reserved for the officers & soldiers, until the apportionment &c. for which it provided, should be made, did not prohibit locations upon surveys made prior to the date of the act.

Location, survey &c. defined— their effects &c.

The act of 1781, of Va. setting apart the territory west of the Tennessee river for appropriation by the officers and soldiers, did not divest the State of the legal title, nor annul prior vested rights.

Spring Term
1839.

Rollins et al
vs
Clark.

If those reservations had been understood as vesting in the body of officers and soldiers, the paramount title to the land, *Virginia* would not thus have extinguished the unlocated claims of those meritorious men to all lands in Kentucky.

The substituting act of 1781 was also entirely prospective. It operated only as a reservation, of the land west of the Tennessee, from future appropriations by treasury warrants; and, as already suggested, a valid *location* previously made, was an appropriation which vested an acknowledged right to a defined tract.

The act of 1781 does not import a retroactive object or operation as to any such prior appropriation. To give such an enactment such a retrospective interpretation, would be unreasonable and unjust. If the fact had been known, that locations on treasury warrants, had been made west of the *Tennessee*, and the Legislature had intended to invalidate them, that purpose would have been expressed: and if the Legislature did not know that such locations had been made, there could have been no motive for intending that the reservation made by the act of 1781, should have any other than the prospective effect alone imported by the enactment itself. That act reserved only vacant land. It neither affected, nor was intended to affect, any private right—if any such there was—which had been previously acquired for a valuable consideration, and was then subsisting under the act of 1779. This conclusion, if it need any extraneous support, is fortified by the express authority of the Court of Appeals of *Virginia*.

In a case adjourned from the Supreme Court of the then District of Kentucky, on a *caveat*, issued in 1786, at the instance of the superintendents of the officers and soldiers, to prevent the emanation of a grant to George Rogers Clark, for the land located by him, in 1780, west of the *Tennessee*, the Court of Appeals of *Virginia* decided, in November, 1791, that the act of 1781, *supra*, operated only as a prospective reservation, and did not destroy, or even impair, any right previously vested in Clark in consequence of his locations.

And the same Court decided, in the same case, that whether Clark's locations in 1780 were valid or void, depended altogether on a question of fact, and that was—whether the territory west of the *Tennessee* was embraced by any of the exceptions herein before quoted from the act of 1779. And therefore, as it was, in the opinion of that Court, incumbent on the *plaintiffs* in the *caveat* to show that this land was excepted from appropriation under treasury warrants authorized by the general enactment of 1779; and as there was in that case, according to the judgment of that Court, no sufficient proof of that assumed fact, the *caveat was dismissed.* See the case, as reported in *Hughes, page* 39.

We can perceive no ground, therefore, for the assumption that Clark's survey of 1784 was void or illegal.

Nor can we decide that, at the date of Clark's entry, the land west of the *Tennessee* was not subject to such appropriation by the authority of the act of 1779.

And upon this point, we might be content to repose on the decision of the Supreme Court of *Virginia,* as reported in *Hughes;* for we presume that Court possessed all the means which are afforded to us for ascertaining the extrinsic facts which should be required to show whether the land west of the *Tennessee* was embraced by either of the two exceptions, one of which must include it, if it was not subject to appropriation by treasury warrants, under the act of 1779.

But as the question is important, and the decision of one Court upon mere matters of fact, is not authoritative in another, in a different case, even on the same facts, we will decide for ourselves without regard to any previous adjudication elsewhere.

Upon the question we are now considering, we are left without any other information than such as we may derive from our judicial knowledge: first—of the legislation and policy of Virginia, whilst colonial and when independent, concerning the *Indian* tribes inhabiting lands and asserting usufructuary rights within the limits of that State, and antecedently to the separation of Kentucky; secondly—of the history of the *Cherokee* and *Chickasaw* tribes, and of treaties made with them by *Virginia*, and

Spring Term 1839.

*Rollins et al.*
vs
*Clark.*

The lands west of the Tenn. river were subject to appropriation, by treasury warrants, in 1780, by virtue of the Va. act of 1779.

" The Cherokee country" reserved from appropriation by the act, did not include those lands; nor had they been reserved for the Chickasaws, or any other particular tribe of Indians.

Spring Term
1839.

Rollins et al.
vs
Clark.

by the *Confederation*; and, thirdly—of the geography of the territories occupied and claimed by those tribes, respectively, in the year 1779 and since.

And our knowledge respecting those general facts is not such as will, in our judgment, authorize the conclusion, either that, at the date of the act of 1779, *"the Cherokee country,"* excepted by it from treasury warrant appropriation, embraced, or was understood as embracing, any part of the territory in that part of the then chartered limits of *Virginia,* which is bounded on the north by the *Tennessee* river; or that this territory had ever been *"reserved"* for the *Chickasaws,* or for any other *"* particular tribe of *Indians,"* by any *"act of assembly,"* previously passed by *Virginia.*

Neither recorded nor traditional history enables us to determine, that the *Cherokees* were ever entitled to, or ever even claimed, any land south or west of the Tennessee river, and near thereto, lower down than a line crossing it but a few miles below the mouth of *Holston* river; and, on the contrary, we have reason to infer that this tribe did not, as late as the year 1779, if ever before, assert any claim to land on or near the Tennessee, west of the line just described.

By the treaty negotiated in the year 1777, at the *Long Island of Holston,* between the *Cherokee* Chiefs and *William Christie, William Preston* and *Evan Shelby,* commissioners from *Virginia,* and *Waitstill Avery, Robert Lanier, Joseph Winston* and *William Sharp,* commissioners of *North Carolina,* the eastern boundary of the *Cherokee* country was fixed at a point on the *Ohio* river, considerably above the mouth of the *Kentucky;* thence nearly a direct course to *Cumberland Gap;* thence, nearly the same course to the mountain, six miles south of *Noli*-chuckey; and the Cumberland river, from its mouth to a point above Nashville, and a line nearly south from that point, and crossing the *Tennessee* not far below the mouth of *Holston,* seems to have been another boundary of "the Cherokee country."

At the treaty negotiated with the same tribe, in November, 1785, at *Hopewell* on the *Keowee, Tassel* and other *"head men"* of that tribe disavowed any preten-

sion of claim to the territory on or near the Tennessee river, west of the line before described as crossing not far below the mouth of Holston. By that treaty, the following conventional line was designated and established: to wit. beginning on the Ohio river, between the Cumberland and Tennessee; thence, on the dividing ridge between those two latter rivers, to a point above Nashville; thence, nearly north, to the Cumberland river, about forty miles above Nashville; thence with that river, to the old ford, at or near which the treaty line of 1777, crossed it; thence, to the mountain, six miles south of Nolichuckey; thence south, by various designated points, to the south fork of the Oconee. It was suggested by the Cherokee representatives at that treaty, that their tribe had no authority to cede the territory included by the ridge dividing the waters of Tennessee and Cumberland, and by a line therefrom to the latter river, and thence to the Ohio—because they there declared, that the land between the Cumberland and Tennessee was a common hunting ground for "all the Indians." But it was suggested to them, that the Chickasaws, who claimed the land about Nashville, were willing that the white inhabitants thereon should retain it, and that, as the Chickasaws had not reached Hopewell, and would not probably do so in convenient time, if at all, therefore, they (the Cherokee delegation) ought to fix a line for the Chickasaws, and they thereupon consented to the line as described in the treaty; and virtually admitted that they had no title to any land west of the Tennessee.

Now, it appears that the Cherokees disclaimed any exclusive right to any land south of the Cumberland river, below a point forty miles above Nashville, and acknowledged that they had never pretended to have a claim to the land west of the Tennessee.

We do not, therefore, feel authorized to presume that, in reserving "the Cherokee country," by the act of 1779, the Legislature embraced or intended to embrace, that portion of the territory of Virginia which lies west of the Tennessee river. Besides, the fact that the Tennessee was made one of the boundaries of the military reser-

Spring Term
1839.

Rollins et al.
vs
Clark.

vation, proves, almost conclusively, that, in 1779, when that reservation was confirmed, even the land between the *Cumberland* and *Tennessee*, below the point where the *Virginia* boundary line crosses the latter river, was not considered as being within the limits of the *Cherokee* country or claim; and the same fact tends, as strongly, to the conclusion, that the same Legislature did not suppose that the *Cherokee* claim included any of the land within the *Virginia* boundary, west of the *Tennessee* river, still farther from the Cumberland, which had once been claimed and recognized as their southern boundary.

Nor do we feel authorized to infer, that the exception in the act of 1779, of "lands reserved by act of assembly for any *particular* nation or tribe of Indians," was understood as embracing any of the lands west of the *Tennessee*.

It had been the invariable doctrine of *Virginia*, as well as that of the of the other *American Colonies*, that savage tribes of *Indians*, within the colonial jurisdiction, were in a state of *quasi* pupilage to the Anglo-American sovereign, who was entitled to a fee simple in the soil, and to a preemptive right to purchase the aboriginal titles, which were not admitted to be more than mere usufructuary rights. But to conciliate the good will of the Indians, and secure peace and justice, *Virginia*, like the other colonies, always interdicted intrusions by white men on lands occupied or claimed by any savage tribe within its borders, and would never recognize the validity of any purchase of land made by a citizen from an Indian. And for effectuating that policy, various acts were passed by the Legislative authority, for securing certain Indian tribes in their claims and possessions within the limits of *Virginia*. But we have neither seen nor heard of any such act, in favor of the Chickasaws, for land west of the Tennessee, or elsewhere.

We know not any fact which would authorize a presumption that, as early as 1779, the Legislature of Virginia was acquainted with the boundary of the *Chickasaw* lands, or had any reason to apprehend that it included any territory within the limits of *Virginia*. In the

autumn of the year 1780, after *General Clark* had erected Fort *Jefferson*, on the Mississippi, about five miles below the mouth of the Ohio, the *Chickasaws*, then claiming the lands there, expressed some alarm and resentment on account of a supposed intrusion on their rights. And not only is this the first historic intimation, we have seen, of a claim by that tribe, to any portion of the land within the chartered limits of *Virginia*, west of the Tennessee, but we have not learned that even then, or until some years afterwards, the nature or extent of their claim was either known or recognized by Virginia.

By a treaty concluded between the confederation and the *Chickasaws* at *Hopewell*, in January, 1786, the *Tennessee* river, from its mouth up to a point above the crossing of the now established southern boundary of Kentucky, was recognized as the northern boundary of that tribe of Indians. But whether *Virginia* had previously been apprised of the extent and character of the *Chickasaw* claim, or had admitted its validity, has not been made to appear. In the year 1784, the superintendents of the military surveys west of the *Tennessee*, being obstructed in the execution of their trust by some of the *Chickasaw Indians*, and apprehending forcible opposition to the further prosecution of the surveying, appealed to *Virginia* for support; and thereupon, the Legislature of that State, on the recommendation of its Governor, *and for the purpose of avoiding a savage border war*, suspended the surveys; but did not, *as it did for all other places*, prescribe any limitation to the time of making surveys in that district of country; nor was any other territory substituted for the officers and soldiers. These facts conduce rather to the conclusion that, even in the years 1784–5, *Virginia* did not recognize the validity of the *Chickasaw* claim to any of the lands dedicated by the act of 1781, to the use of the officers and soldiers.

But the single fact that, in 1781, the Legislature reserved this territory from appropriation by treasury warrants, and set it apart for the officers and soldiers, tends persuasively to show that, at that time, notwithstanding the information derived from *General Clark*, in the autumn of 1780, *Virginia* did not admit or intend to

recognize or respect the *Chickasaw* pretension of title. And, *a fortiori*, that pretension was either not known or not regarded by *Virginia*, in 1799, when the act of that year reserved from appropriation all "lands secured by "act of Assembly to any *particular* nation or tribe of In-"dians;" and when too, the *Tennessee* river was recognized as a boundary of the reservsd military district, although the *Chickasaw* claim extended east beyond that river, and probably to the *Cumberland* river.

The only reason why the military reservation, made by the resolution of 1778, and confirmed by the act of 1779, was not, in the first instance, extended beyond the *Tennessee* river, may, as we presume, be found in the fact, that the southern boundary line of *Virginia* had not then been either established or surveyed; and whether it would strike the river *Mississippi*, or how far below the mouth of the Ohio, was a question undetermined and doubtful. Possibly another reason may have had influence; that is, some uncertainty and doubt as to the precise limits of "the Cherokee country"—which was reserved by the act of 1779. But nevertheless, land *not actually included within that country, whatever was in its true boundary, was not embraced by the reservation.*

But after Doctor Walker had run a line on what he supposed to be the charter latitude, and, by extending it, had reached the *Mississippi*, the Legislature of *Virginia*, not doubting that the extensive territory between the Tennessee and Walker's line to the Mississippi, was the property of that State, and not knowing or believing that it was encumbered with any Indian title hitherto protected by any statutory reservation, or any Indian *claim* which would ever be seriously asserted, did not hesitate to subject it, at once, to appropriation by the officers and soldiers, who were among the last of *Virginians* whom the councils of that State would have voluntarily subjected to the vexation and peril of a conflict with savage claimants of the same soil.

We, therefore, come to the conclusion, that it would be rather unreasonable to presume that the Legislature excepted, or intended to except, from the general operation of the act of 1779, any land which might be ascer-

tained to be within the limits of Virginia, between the Tennessee river and the then *unascertained* southern line.

Wherefore, we are of the opinion that the entry of George Rogers Clark, in May, 1780, was authorized by law, and that his survey of 1784, was legal. And consequently, his patent of 1795, vested in him the legal title, subject only to the *Chickasaw* title to occupancy, as recognized by the treaty of 1786, and guarantied by the federal constitution; and the extinguishment of that title by the treaty of 1818—inuring, as it did, to his benefit, and that of his alienee—the legal title of the latter seems, on its face, to be perfect.

*Third.* But if the facts we have considered, or any other facts not now appearing to us, should be sufficient to show that the territory west of the Tennessee was not subject to appropriation in the year 1780, and that the entry of *George Rogers Clark* was therefore unauthorized and void—still we should be of the opinion that his patent should not be deemed also void.

If an entry which was made in '80, (under a supposed authority of a Va. law,) should be deemed void, it would not follow that therefore a patent for the land granted by the State of Ky., is also void. For—

At the date of that grant, Kentucky had undoubted power to dispose of the title to all the land between the Tennessee river and the southern boundary of the State. And therefore, had the Legislature of this State specially instructed the Register to issue a patent to Clark, upon his survey of 1784, or had it, by special act of Assembly, granted the land to him, his legal title would, on its face, be indisputable.

A Ky. act of '94, directed that 'the Register of this State should receive and issue grants on all certificates of survey which were in the Register's office of Virginia at the time the separation took place, and upon which grants had not issued'; and, as the Register was bound by this act, to issue patents upon certificates so received, whether they were valid or not, a patent issued in obedience to it, cannot be deemed void in a court of law.

Now, though there was no such special authority or grant, nevertheless an act was passed in 1794, by the Kentucky Legislature, which had the same effect, so far as the validity of the patent of 1795, may be concerned, in a court of common law.

By the second section of that act, it was enacted as follows: "That the Register of this State *shall* receive, " and *issue grants on all certificates of survey which were in* "*the Register's office of Virginia at the time the separation* "*took place, and on which grants have not issued.*"

This provision is comprehensive and peremptory. It left to the Register no authority to judge whether a survey transmitted from the Register's office of Virginia, had been made on a valid or invalid entry. No discrim-

ination was made by the statute, or could be made by the Register, between entries on which certificates of surveys had been made, or between certified surveys, made prior to the separation. From the facts in this case, we feel authorized to presume, that Clark's survey of 1784, had been certified to the Register's office of Virginia; and that the certificate had been received by the Register of this State.

It seems clear to us, therefore, that, whether Clark's entry was void or not, the act of 1794 not only authorized, but made it the imperative duty of the Register to issue a patent on the certificate of survey—*as he seems to have done in obedience to that act.* We cannot admit that a patent thus issued pursuant to the authority and mandate of the law, can be deemed void in a court of law, merely because the entry of the patentee was invalid.

Wherefore, it is considered that the judgment of the General Court be affirmed.