UNITED STATES v. BOARD OF COM'RS OF McINTOSH COUNTY. SAME
v. STUCKEY, County Treasurer. SAME v. RANSON,
County Treasurer.

(District Court, E. D. Oklahoma. March 19, 1921.)

Nos. 2594, 2621, 3184.

1. States ⊂⊃9—Irrevocable ordinance required by Enabling Act relating to government lands is binding.
The irrevocable ordinance inserted in the Constitution of Oklahoma and required by Enabling Act, § 3, par. 3, which disclaimed title to unappropriated public lands or lands held by Indians, is a continuing and binding obligation on the state after its admission into the Union, in so far as it may be a matter of federal cognizance.

2. Taxation ⊂⊃6—States cannot tax instrumentalities of federal government.
The states cannot tax or otherwise impose burdens on the exclusive powers of the federal government or on its instrumentalities employed to carry such governmental powers into execution.

3. Taxation ⊂⊃18—Federal government cannot tax state instrumentalities.
The national government cannot tax exclusive agencies of the states employed to carry their powers into execution except as such exemption may be modified by Const. U. S. Amend. 16, authorizing the income tax.

4. Taxation ⊂⊃181—Allotments to citizen Indians taxable, in absence of express restrictions.
Tribal lands allotted in severalty to Oklahoma Indians who were then citizens of the United States are subject to taxation by the state in the same manner as other lands, unless such allotment has been specifically or by express and clear implication exempted or reserved from taxation.

5. Taxation ⊂⊃181—Oklahoma Constitution, exempting Indian lands from taxation, applies only to existing exemptions.
Const. Okl. art. 10, § 6, exempting from taxation property exempt by reason of treaty stipulations existing between Indians and the government, or by federal laws during the force and effect of such treaties or laws, obviously exempts such lands only as were exempt under treaties and laws in existence when the state was admitted.

6. Taxation ⊂⊃181—Acts extending restrictions on alienation of Indian lands did not extend exemption from taxation to inherited lands.
Act April 26, 1906, § 19, providing that all Indian lands upon which restrictions on alienation are removed shall be subject to taxation, and that other lands shall be exempt from taxation so long as the title remained in the original allottee, and Act May 27, 1908, § 4, providing that lands from which restrictions on alienation have been or shall be removed shall be subject to taxation with a proviso that allotted lands should not be subjected to any claim against the allottees arising prior to the removal of restrictions, did not operate to extend the exemption from taxation to lands inherited from the original allottees by full-blood Indian heirs in cases where such exemption was not given by the several allotment acts relating to the different nations.

7. Constitutional law ⊂⊃48—Exemption of Indian lands from taxation construed to conform to Oklahoma Constitution.
Act May 27, 1908, § 4, relating to the exemption of Indian lands from taxation, which was enacted shortly after Oklahoma was admitted as a state, should not be construed so as to conflict with Const. Okl. art. 10, § 6, exempting only lands then exempt under existing laws, if as reasonable a construction can otherwise be reached.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8. Taxation** ⬅️**181—Lands purchased for Indians with proceeds from restricted lands not exempt.**

Lands theretofore taxable, which were purchased for a Creek Indian by the Secretary of the Interior with the proceeds of oil royalties from restricted lands or of the sale of lands whose alienation was prohibited without the approval of the Secretary, the deeds to which purchased lands contained a clause declaring that no lease, deed, mortgage, power of attorney, contract of sale, or other instrument affecting the title thereto should be of any force without the approval of the Secretary of the Interior are not exempted from taxation by the state, by Act April 26, 1906, § 19, exempting Indian lands so long as the title remained in the original allottee, or Act May 27, 1908, § 4, exempting allotted lands from claims against allottees arising prior to the removal of restrictions on alienation, and also providing that such lands from which restrictions on alienation have been or shall be removed shall be subject to taxation.

**9. Taxation** ⬅️**181—Oklahoma Enabling Act and Constitution do not exempt lands purchased for Indians.**

The provisions of the Oklahoma Enabling Act and Constitution exempting from taxation property belonging to or thereafter purchased by the United States and all Indian property exempted by existing treaties or laws do not exempt from taxation lands theretofore taxable, after their purchase by the Secretary of the Interior for a full-blood Creek Indian, to be held under the same restrictions on alienation as were imposed on the lands from which the purchase price was derived as oil royalties or proceeds of sale.

Three separate suits by the United States against the Board of Commissioners of McIntosh County, against W. W. Stuckey, Treasurer of Tulsa County, and against J. P. Ranson, Treasurer of McIntosh County. Judgment rendered for defendant in each suit.

C. W. Miller, U. S. Atty., and L. K. Pounders, Sp. Asst. U. S. Atty., both of Muskogee, Okl.

N. A. Gibson and Jos. L. Hull, both of Muskogee, Okl., W. L. McPherson, of Eufaula, Okl., and W. R. Seaver, of Tulsa, Okl., for defendants.

WILLIAMS, District Judge. The following questions are involved in the above styled and numbered cause:

(1) Are lands theretofore taxable under the state laws, and afterwards purchased under the supervision of the Secretary of the Interior from their bona fide non-Indian owners with royalties accruing under such supervision to a full-blood Creek Indian from part of her restricted allotment, exempted or freed from state taxation by virtue of the clause inserted by the grantor in the deed to her under the direction of and at the instance of and requirement of the Secretary of the Interior, providing "that no lease, deed, mortgage, power of attorney, contract to sell, or other instrument affecting the land herein described or the title thereto, executed during the lifetime of said grantee at any time prior to April 26, 1931, shall be of any force and effect or capable of confirmation or ratification, unless made with the consent of and approved by the Secretary of the Interior"; the conveyance being dated December 28, 1914, and prior to its delivery and recording the following certificate of the Secretary of the Interior being thereto annexed:

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"I hereby certify that the land described in the above deed was purchased for the said Ella Jones with funds held in trust by the United States for her benefit derived from oil royalty on leases covering lands allotted for her, restricted by virtue of her enrollment as a full-blood citizen of the Creek Nation, * * * and that said purchase was made and said deed was executed and the same is hereby approved.pursuant to the regulations prescribed by the Secretary of the Interior under Act of Congress approved May 27, 1908, and the Act approved August 1, 1914."

(2) Are lands theretofore taxable under state statutes, and afterwards purchased under the supervision of the Secretary of the Interior from their non-Indian bona fide owners with funds accruing under his supervision to a full-blood Creek Indian as a part of the proceeds of the sale of the lands allotted and patented to her as a part of her allotment and restricted, so as to be inalienable without the consent of the Secretary of the Interior, prior to December 1, 1913, which were sold by her subject to the conditions, inserted under the direction and at the instance of the Secretary of the Interior in the deed from the grantors to her, that the purchase price paid therefor should be received by the Secretary of the Interior or his agents and by him held in trust as a trust fund and by him disbursed under the laws, rules, and regulations of the Secretary of the Interior for her benefit, the conveyances by which said lands thus acquired containing a clause inserted by the grantor under the direction of, and at the instance of and by said requirement of the Secretary of the Interior, provided "that no lease, deed, mortgage, power of attorney, contract to sell, or other instrument affecting the land herein described or the title thereto, executed during the lifetime of said grantee at any time prior to April 26, 1931, shall be of any force and effect or capable of confirmation or ratification unless made with the consent and approval of the Secretary of the Interior," and prior to its delivery and recording the following certificate of the Secretary of the Interior being thereto annexed:

"That the land described in the above deed purchased for ——— with funds derived from the sale of lands allotted to ——— on the final approved rolls of citizens by blood of that nation, and that said purchase was made and said deed approved pursuant to the Act of Congress of May 27, 1908, which authorized the Secretary of the Interior to remove restrictions from allotted lands of the Five Civilized Tribes 'wholly or in part, under such rules and regulations concerning terms of sale and Disposal of the Proceeds for the benefit of the respective Indians as he may prescribe' "

—thereby exempted or rendered free from state taxation?

[1] The people inhabiting the proposed state of Oklahoma, by the terms of paragraph 3 of section 3 of the Enabling Act (34 Stat. 267) were by irrevocable ordinance required to—

"agree and declare that they forever disclaim all right and title in or to any *unappropriated public lands* lying within the boundaries thereof, and to all lands lying within said limits *owned or held by any Indian, tribe, or nation,* and that until the title to any such *public land* shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States; that land belonging to citizens of the United States residing without the limits of said State shall never be taxed at a higher rate than the land belonging to residents

*thereof; that no taxes shall be imposed by the State on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use."* (Italics mine.)

To the foregoing mandatory conditions the people of the proposed state, through their constitutional convention, by irrevocable ordinance agreed. A similar requirement has been imposed upon every state, except Vermont, Kentucky, Tennessee, Maine, and Texas, preliminary to. admission into the Union. In so far as it may be a matter of federal cognizance, the same became a continuing and binding obligation on the part of the state after its admission into the Union. Coyle v. Smith, 221 U. S. 559, 31 Sup. Ct. 688, 55 L. Ed. 853; Id., 28 Okl. 121, 113 Pac. 944; Joplin Mercantile Co. v. U. S., 236 U. S. at page 547, 35 Sup. 291, 59 L. Ed. 705.

Section 1 of said Enabling Act contained the following proviso:

*"Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed."* (Italics mine.)

Said provision was not required to be accepted by irrevocable ordinance, such being not essential, as it related to a matter within the exclusive control of the Congress and so continues, unless remitted by the Congress to the state authority. Tiger v. Western Inv. Co., 221 U. S. at page 309, 31 Sup. Ct. 578, 55 L. Ed. 738. Said provision of section 3 of the Enabling Act was also in substance incorporated in section 3 of article 1 of the Constitution of the state.

[2, 3] That the states cannot tax or otherwise impose burdens on the exclusive powers of the federal government or its instrumentalities employed to carry such governmental powers into execution is beyond question. The same limitation rests upon the national government as to exclusive agencies of the states unless modified by the Sixteenth Amendment as to taxation which relates to incomes. Weston v. Charleston, 2 Pet. 449, 7 L. Ed. 481; McCulloch v. Maryland, 4 Wheat. 316, 431, 439, 4 L. Ed. 579; Bank of Commerce v. New York City, 2 Black. 620; Collector v. Day, 11 Wall. 113, 124, 20 L. Ed. 122; United States v. Railroad Co., 17 Wall. 322, 21 L. Ed. 597; Railroad Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787; Knowlton v. Moore, 178 U. S. 59, 20 Sup. Ct. 747, 44 L. Ed. 969.

Beginning with Ohio, it has been customary for the federal government, in admitting the new states into the Union, "to require from that state—though without necessity—a stipulation that the public domain lying within its limits shall not be taxed by the state." Cooley on Taxation, vol. 1 (3d Ed.) p. 135. The Ohio Enabling Act (Act April 30, 1802) provides that:

"Every and each tract of land sold by Congress * * * shall be and remain exempt from any tax laid by order or under the authority of the State * * * for the term of five years from and after the day of sale."

The Louisiana Enabling Act (Act Feb. 20, 1811), in addition, required an agreement on the part of the state, by irrevocable ordinance, that the people—

"agree and declare that they forever disclaim all right or title to the waste or unappropriated lands lying within the said territory, and that the same shall be and remain at the sole and entire disposition of the United States," and that "the lands belonging to citizens of the United States residing without the said state shall never be taxed higher than the lands belonging to persons residing therein."

The Illinois Enabling Act (Act April 18, 1818), in addition, required an agreement, by irrevocable ordinance, that the—

"bounty lands granted, or hereafter to be granted, for military services during the late war, shall, while they continue to be held by the patentees, or their heirs, remain exempt, as aforesaid, from all taxes, for the term of three years."

The Iowa Enabling Act (Act March 3, 1845), in addition, required that—

"the said State shall never interfere with the primary disposal of the soil within the same by the United States nor with any regulations Congress may find necessary for securing the title in such soil to the bona fide purchasers thereof; and that no tax shall be imposed on lands the property of the United States," and that "the bounty lands granted, or hereafter to be granted, for military services during the late war, shall, while they continue to be held by the patentees or their heirs, remain exempt from any tax laid by order or under the authority of the state * * * for the term of three years."

The Nevada Enabling Act (Act March 21, 1864), in addition to the foregoing provided that—

"No taxes shall be imposed by said State on lands or property therein belonging to, or which may hereafter be purchased by, the United States."

The Enabling Act for the Dakotas, Montana, and Washington (section 4) seems to be a prototype of that of Oklahoma and contains substantially the same provisions.

When the original thirteen colonies obtained their independence from the king of England, each succeeded to the unappropriated public lands within its boundaries, the same prior to that time having been the property of the crown. Clark v. Smith, 13 Pet. 195, 10 L. Ed. 138; Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681; Pollard's Lessee v. Hagan, 3 How. 212, 11 L. Ed. 565; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; De Weese v. Reinhard, 165 U. S. 386, 17 Sup. Ct. 340, 41 L. Ed. 757.

Vermont succeeded to all the rights of the crown to the unappropriated public lands. Town of Pawlet v. Clark, 13 U. S. (9 Cranch) 292, 3 L. Ed. 735.

Kentucky, which was originally a part of Virginia, succeeded to such unappropriated public lands. Colson v. Lewis, 15 U. S. (2 Wheat.) 377, 4 L. Ed. 266; Boone and Talbot v. Helm, 34 Ky. (4 Dana) 403; Rollins v. Clark, 38 Ky. (8 Dana) 15.

Maine being erected out of the territory of Massachusetts by virtue of act of Massachusetts Legislature of June 19, 1819 (St. 1819, c.

161), one-half of the unappropriated public lands within its bounds were reserved by Massachusetts, and the other half granted to the state of Maine. Lapish v. Wells, 6 Me. (6 Greenl.) 175; Emerson v. County of Washington, 9 Me. (9 Greenl.) 88; Fisk v. Briggs, 12 Me. 373; Roberts v. Richards, 84 Me. 1, 24 Atl. 425.

Tennessee was erected out of territory ceded to the United States by act of Legislature of North Carolina February 25, 1790 (1 Scotts Laws Tenn. p. 435), without any reservations. By Act of Congress April 18, 1806 (2 Stat. 381), certain lands were surrendered to the state, the other lands by said act being retained. By Act of Congress Aug. 7, 1846 (9 Stat. 66), the lands thus retained were surrendered to the state. Burton's Lessees v. Williams, 5 Wheat. 529, 4 L. Ed. 452; Fogg v. Williams, 2 Head (Tenn.) 474.

Texas by joint resolution for annexation, approved March 1, 1845, retained her public lands. 5 Stat. 797; De Weese v. Reinhard, 165 U. S. 386, 17 Sup. Ct. 340, 41 L. Ed. 757.

As to the other states, when admitted into the Union, except where specifically granted to the state, the unappropriated public lands have been expressly retained by the federal government. Willow River Club v. Wade, 100 Wis. 86, 76 N. W. 273, 42 L. R. A. 305; Clements v. Anderson, 46 Miss. 581.

The controversies arising with the federal government relating to the unappropriated public lands obviously occasioned the incorporation of such requirements in Enabling Acts or acts of admission. In Ward v. Board of County Commissioners of Love County, Oklahoma, 253 U. S. 17, 40 Sup. Ct. 419, 64 L. Ed. 751, decided by the Supreme Court of the United States on April 26, 1920, it is said:

"In the act of 1906, enabling Oklahoma to become a state, Congress made it plain that no impairment of the rights of property pertaining to the Indians was intended (chapter 3335, § 1, 34 Stat. 267); and the state included in its Constitution a provision exempting from taxation 'such property as may be exempt by reason of treaty stipulations, existing between the Indians and the United States government, or by federal laws, during the force and effect of such treaties or federal laws.' Article 10, § 6."

Section 1, Act of May 27, 1908 (35 Stat. 312), with reference to restrictions against alienation provided that the Secretary of the Interior—

"may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe."

This provision was construed by the Circuit Court of Appeals for the Eighth Circuit in United States v. Law, 250 Fed. 218, 162 C. C. A. 354, wherein it was held:

"Under Act May 27, 1908, c. 199, § 1, 35 Stat. 312, declaring that all allotted lands of enrolled full-bloods and enrolled mixed-bloods of three-quarters or more Indian blood, shall not be subject to alienation prior to April 26, 1931, but that the Secretary of the Interior may remove such restrictions wholly or in part, under such rules and regulations concerning the terms of sale and disposal of the proceeds for the benefit of the Indians as he may prescribe, where the Secretary of the Interior conditionally consented to a full-blood Cherokee's alienation of her allotment, and, reserving the right to

dispose of the proceeds of the sale, with the approval of the Indian Superintendent, invested the proceeds in other lands, which were conveyed to the allottee with a restriction against alienation prior to 1931, the date fixed in the act, such restriction was valid."

Can this case be said to be authority for the Secretary of the Interior, as a federal agency, to exempt or exclude such acquired lands from taxes laid under authority of the state, and if so is such act valid? In said opinion it is said:

"It is contended by the appellee that no power exists even in Congress to withdraw lands once subject to taxation by state authority from such status of taxability, and that the restrictions upon alienation imposed by the Secretary of the Interior upon the new land purchased for Amanda Perry undertake to effect such withdrawal of the new land. The question whether exemption from taxation was attempted to be created by the restriction provision contained in the deed of the new land to Amanda Perry, and the further question whether Congress could authorize the creation of such exemption as to this new land, or the transfer of the exemption from the old land to the new, are neither of them involved in the present case, and we express no opinion thereon."

"McCurdy v. United States, 246 U. S. 263, 38 Sup. Ct. 289, 62 L. Ed. ——, is not opposed to the conclusion here reached. In that case the principal question decided was whether the Secretary of the Interior had authority to order inserted in a deed of land running to an Osage Indian the following clause: 'This conveyance is made and accepted with the understanding, and under the condition that the above described property is to be and remain inalienable and not subject to transfer, sale or incumbrance, for a period of eighteen years from the 1st day of July, 1913, except by and with the express consent and approval of the Secretary of the Interior, or his successor in office.' The facts in the case were that the United States held certain funds in trust for the Osage Indians and to their individual credit."

[4] After tribal lands have been allotted in severalty to members of the Tribe, and such members of the Tribe have become citizens of the United States, upon the erection of the state in whose bounds such lands are located, such allotment of such Indian citizens becomes subject to state taxation in the same manner as other lands located therein belonging to other citizens, unless such allotment has been specifically or by express and clear implication exempted or reserved from taxation. Goudy v. Meath, 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130.

The lands of the Seminole Tribe were allotted under agreement of December 16, 1897, which was ratified by Congress July 1, 1898 (30 Stat. 567; Laws Relating to the Five Civilized Tribes in Oklahoma, 1890–1914, page 266), and which provided that—

"All contracts for sale, disposition, or encumbrance of any part of any allotment made prior to date of patent shall be void. * * * When the tribal government shall cease to exist the principal chief last elected by said tribe shall execute, under his hand and the seal of the nation, and deliver to each allottee a deed conveying to him all the right, title, and interest of the said nation and the members thereof in and to the lands so allotted to him, and the Secretary of the Interior shall approve such deed, and the same shall thereupon operate as relinquishment of the right, title, and interest of the United States in and to the land embraced in said conveyance, and as a guarantee by the United States of the title of said lands to the allottee; and the acceptance of such deed by the allottee shall be a relinquishment of his title to and interest in all other lands belonging to the tribe, except such as

may have been excepted from allotment and held in common for other purposes. Each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, *be made inalienable and nontaxable as a homestead in* perpetuity." (Italics mine.)

The Supplemental Seminole Agreement, dated October 7, 1899, which was ratified by Congress on June 2, 1900 (31 Stat. 250; Laws Relating to Five Civilized Tribes, Oklahoma, 1890–1914, p. 313), provides as follows:

"Second. If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs .who are Seminole citizens, according to the laws of descent and distribution of the State of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under said laws the same shall first go to the mother instead of the father, and then to the brothers and sisters, and their heirs, instead of the father."

In said paragraph in the original Seminole treaty, that "each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity," the term "inalienable" is used as a restriction against voluntary alienation or conveyance, for, had it been intended to mean involuntary as well as voluntary inalienability, why add the words "and nontaxable," when it would be surplusage? Goudy v. Meath, supra; Betts v. Commissioner of Land Office, 27 Okl. 64, 110 Pac. 766. The provision in said original agreement, "all contracts for sale, disposition, or encumbrance of any part of any allotment made prior to date of patent shall be void," has no application as a restriction after issuance of patent.

By section 8 of the Act of March 3, 1903 (32 Stat. 982; Laws Relating to the Five Civilized Tribes in Oklahoma, 1890–1914, p. 440), it is provided that the tribal government of the Seminole Nation shall not continue longer than March 14, 1906, and that the Secretary of the Interior shall at the proper time furnish the principal chief with blank deeds necessary for all conveyances mentioned in the agreement with the Seminole Nation, contained in the Act of July 1, 1898 (30 Stat. 567), and that said principal chief shall execute and deliver said deeds to the Indian allottees as required by said act, and the deeds for allotment, when duly executed and approved, shall be recorded in the office of the Dawes Commission prior to delivery and without expense to the allottee until further legislation by Congress, with the proviso that the homestead referred to in said act shall be inalienable during the lifetime of the allottee not exceeding 21 years from the date of the deed for the allotment, and that a separate deed shall be executed for said homestead, and that during the time the same is held by the allottee it shall not be liable for any debt contracted by the owner thereof.

The Act of Congress approved April 21, 1904 (33 Stat. 189; Laws

Relating to the Five Civilized Tribes in Oklahoma, 1890–1914, p. 448), provides:

"All the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed, and all restrictions upon the alienation of all other allottees of said tribes except minors and except as to homesteads, may, with the approval of the Secretary of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe, upon application to the United States Indian agent at the Union Agency in charge of the five Civilized Tribes if said agent is satisfied upon a full investigation of each individual case that such removal of restrictions is for the best interest of said allottee."

Said provision of said Act of April 21, 1904, had the effect of removing restrictions imposed by said clause, "all contracts for sale, disposition or encumbrance * * * of any allotment [Seminole] made prior to the date of patent shall be void," except as to homesteads and minors, where the allottee was not of Indian blood, and to permit the removal of such restriction against alienation prior to the issuance of patent by all other allottees except minors, and as to all allotments, except homesteads, with the approval of the Secretary of the Interior. Goat v. U. S., 224 U. S. 458, 32 Sup. Ct. 554, 56 L. Ed. 841; Godfrey v. Iowa Land & Trust Co., 21 Okl. 293, 95 Pac. 792. Prior to the passage of the Act of April 26, 1906 (34 Stat. 137; Laws Relating to the Five Civilized Tribes in Oklahoma, 1890–1914, p. 495), in cases where patents had issued, neither did any exemption as to taxation nor any restriction against alienation in cases of adults exist as to that part of the Seminole allotment not included in the homestead. Prior to and by the passage of said Act of April 26, 1906, inherited allotted tribal land in the Seminole Tribe to which patent had been duly issued and delivered to the allottee were freed from taxation, unless it be held that the clause, "be made inalienable and nontaxable as a homestead in perpetuity," comprehends a term beyond the period of the life of the allottee, and that the third proviso to section 19 of Act of April 26, 1906, which restricts the exemption as long as the title remains in the original allottee, is to that extent ineffectual. It is not essential here to determine the meaning of the words "as a homestead in perpetuity."

The Choctaw and Chickasaw Original Treaty under date of April 23, 1897, ratified by Congress on June 28, 1898 (30 Stat. 495; Laws Relating to the Five Civilized Tribes in Oklahoma, 1890–1914, p. 248), provides:

"All the lands allotted shall be nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent, and each allottee shall select from his allotment a homestead of one hundred and sixty acres, for which he shall have a separate patent, and which shall be inalienable for twenty-one years from date of patent. This provision shall also apply to the Choctaw and Chickasaw freedman to the extent of his allotment. Selections for homesteads for minors to be made as provided herein in case of allotment, and the remainder of the lands allotted to said members shall be inalienable for a price to be actually paid, and to include no former indebtedness or obligation—one-fourth of said remainder in one year, one-fourth

in three years, and the balance of said alienable lands in five years from the date of the patent. * * * "

The original agreement with the Choctaws and Chickasaws under date of April 23, 1897, was ratified by the councils of both nations as required by law; the Chickasaw Council also submitting it to a referendum, which resulted in a majority against it of 112 votes. By said Act of Congress of June 28, 1898, with certain specified modifications to the original Choctaw and Chickasaw Treaty, it was again submitted to a referendum in both nations, and on August 24, 1898, it was ratified. Annual Report Commission to the Five Civilized Tribes in the Indian Territory to the Secretary of the Interior, 1898, p. 6.

In the Choctaw and Chickasaw Nations, on April 26, 1906, all allotted lands of every character being nontaxable "while the title remains in the original allottee, but not to exceed twenty-one years from date of the patent," the third proviso to said section 19 preserving said status, no inherited allotted tribal lands were exempted from taxation.

By section 16 of the Supplemental Creek Agreement dated September 1, 1902, and ratified by Congress on June 30, 1902 (32 Stat. 500; Laws Relating to Five Civilized Tribes in Oklahoma 1890–1914, p. 386), it is provided:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear.

"Selections of homesteads for minors, prisoners, convicts, incompetents and aged and infirm persons, who cannot select for themselves, may be made in the manner provided for the selection of their allotments and if for any reason such selection be not made for any citizen it shall be the duty of said Commission to make selection for him. The homestead of each citizen shall remain, after the death of the allottee, for the use and support of his children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitation herein imposed and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed. Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity."

Each citizen being required to select a part of his allotment as a homestead, "which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear," the word "inalienable" as used in said provision, means a restriction against voluntary alienation or conveyance, and that of "nontaxable" an involuntary alienation or conveyance on account of taxes imposed.

In the same section it is provided, as to that part of the allotment not included in the homestead, "shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval" of said agreement. The term "inalienable," as to that part of the allotment in excess of homestead, is used in the same sense in which the term "inalienable" is used as to the homestead in said section; that is, to prohibit voluntary alienation or conveyances. By the words, "shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation," involuntary alienations or conveyances are meant. In Goudy v. Meath, supra, it is said:

"The original treaty provided that they should be exempt from levy, sale or forfeiture until the Legislature of the state should, with the consent of Congress, remove the restrictions. This of course, meant involuntary as well as voluntary alienation."

In the Creek Nation prior to April 26, 1906, the allotted tribal homestead being exempt from taxation for 21 years from the date of the patent, and that part of the allotment in excess of the homestead for 5 years from the date of the approval of the Supplemental Creek Treaty, which 5 years expired with August 7, 1907 (Baker v. Hammett, 23 Okl. 480, 100 Pac. 1114; Lanham v. McKeel, 244 U. S. 582, 37 Sup. Ct. 708, 61 L. Ed. 1331), during such periods such land was exempt from taxation, whether or not the title was in the original allottee. The third proviso to said section 19 of Act of April 26, 1906, had the effect of modifying and changing this status so that "all other land" except that from which restrictions were removed should be exempt from taxation as long as the title remained in the original allottee, if in that respect it was valid.

By Cherokee Allotting Act July 1, 1902 (32 Stat. 716; Laws Relating to Five Civilized Tribes in Oklahoma, 1890–1914, pp. 412–414), it is provided:

"Sec. 13. Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to forty acres of the average allottable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment. Separate certificate shall issue for said homestead. During the time said homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him.

"Sec. 14. Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs before the expiration of five years from the date of the ratification of this act.

"Sec. 15. All lands allotted to the members of the said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent."

In said Allotting Act of July 1, 1902 (32 Stat. 716; Laws Relating to the Five Civilized Tribes in Oklahoma, 1890–1914, pp. 412 to 414), it is provided by section 13 that "during the time said homestead is held by the allottee the same shall be nontaxable" and shall

"not be liable for any debt contracted by the owner thereof while so held by him," and "inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment"; by section 14 that "lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act"; and by section 15 that "all lands allotted to the members of said tribe except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent."

By said section 13, the term "inalienable" means a prohibition against a voluntary alienation or conveyance, as in the same section the homestead is specifically made nontaxable for a period as long or longer than that for which it is specifically made inalienable. The term "nontaxable" thereby specifically carries a restriction against an involuntary alienation or conveyance on account of taxes imposed by governmental authorities. By section 14 all allotted lands in excess of the homestead "shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation, or be inalienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act." The term "shall not be incumbered, taken or sold," as used in said section, prohibits an involuntary alienation or conveyance, and the term "alienated" a voluntary conveyance. Prior to the passage of the act of April 26, 1906, in the Cherokee Nation, the homestead was exempted from taxation so long as held by the allottee, and the allotted lands in excess of said homestead for the period of five years from July 1, 1902, and such period was to end with the close of June 30, 1907.

On April 26, 1906, inherited tribal lands in the Cherokee Nation, other than the homestead, were nontaxable, with the title in the heirs, until the said five years expired from the date of said allotting act, but the homestead, with the title in the heirs, was taxable. Gannon v. Johnston, 243 U. S. 108, 37 Sup. Ct. 330, 61 L. Ed. 622. The third proviso to said section 19 of Act of April 26, 1906, if in that respect valid, had the effect of modifying, and decreasing in some cases, and extending in others, the tax exemption period as to surplus allotments.

The enabling act for the proposed state of Oklahoma, which was pending and under consideration at the time of the passage of said act of April 26, 1906, was passed on June 16, 1906; the state being admitted into the Union by proclamation of the President on November 16, 1907. The said Act of April 26, 1906, passed preliminary to the erection of a state government including within its bounds that of the Five Civilized Tribes, declared:

"That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the *original allottee*." (Italics mine.)

A few months subsequent to the erection of said state by Act of May 27, 1908, Congress declared:

"That all lands from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

Can it be reasonably said that Congress, in the reimposing of restrictions on inherited allotted tribal lands held by full-blood heirs of the Five Civilized Tribes and not being the original allottees, intended by implication to extend the exemption of taxation to such lands? If so, is it done by such legislative act (not a part of any treaty), by specific language, or by language from which the express implication is so strong as to make the meaning clearly manifest?

[5] Section 6 of article 10 of the Constitution of the state of Oklahoma provides:

"All * * * exempt by reason of treaty stipulations, *existing* [italics mine] between Indians and the United States government, or by federal laws, during the force and effect of such treaties or federal laws," shall be exempt from taxation.

Obviously this means as the same *existed* at the time of the erection of the state on November 16, 1907. Said section 1 of the Enabling Act, as heretofore pointed out, provides that nothing contained in the said Constitution shall be construed—

"to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaty, agreement, or otherwise, which it would have been competent to make if this act had never been passed."

In Romine v. State, 7 Wash. 215, 34 Pac. 924, it was held:

"1. An act of Congress enabling a territory to become a state has no binding force on the people of the territory until they have adopted a Constitution, and the territory has been admitted into the Union; and then, if by their Constitution, the people have expressed no dissent from any proposition contained in the Enabling Act, they are bound by its provisions. But if the Constitution contains any modification of any of the provisions of the Enabling Act, and the state has been formally admitted by the President and Congress into the Union, the modified provisions are to be taken as the existing contract between the State and the Federal government.

"2. Act Cong. Feb. 22, 1889, enabling the territory of Washington to come into the Union, required (sections 10, 11) the public lands previously reserved by Act Cong. March 2, 1853, for school purposes to be disposed of by the state in a specified manner. The Constitution adopted by the people pursuant to such act contained a provision (article 16, § 2) empowering the state Legislature to confirm all previous sales of school lands made in good faith. Held that, whether or not it was the intention of Congress, by the Enabling Act, to repudiate, as unauthorized, all sale of school lands made by the territory, the state of Washington could not question the title of such purchasers, subsequently confirmed by the state Legislature since the above constitutional provisions, under which the state was admitted, modified the proposition in the Enabling Act."

In Tiger v. Western Investment Co., supra, it is said:

"On the other hand, it is contended that the Act of April 26, 1906, in the sections referred to, has undertaken to make new provision for the protection of full-blood Indians of the Five Civilized Tribes, and to place them, as to the alienation, disposition, and incumbrance of their lands, under restrictions such as shall operate to protect them, and to require the Secretary of the

Interior to approve such conveyances, in order that such Indians shall part with their lands only upon fair remuneration, and when their interests have been duly safeguarded by competent authority."

On page 306 of 221 U. S., on page 583 of 31 Sup. Ct. (55 L. Ed. 738), it is further said:

"We think a consideration of this act and of subsequent legislation in pari materia therewith demonstrates the purpose of Congress to require such conveyances by full-blood Indians to be approved by the Secretary of the Interior. The sections of the Act of April 26, 1906, under consideration show a comprehensive system of protection as to such Indians. Under section 19, they are not permitted to alienate, sell, dispose of, or incumber allotted lands within 25 years unless Congress otherwise provides. The leasing of their lands, other than homesteads, for more than one year, may be made under rules and regulations prescribed by the Secretary of the Interior. And in case of the inability of a full-blood Indian, already owning a homestead, to work or farm the same, the Secretary may authorize the leasing of such homestead."

Again following references to sections 20, 22, 23, and 29 of said act, at the bottom of page 309 of 221 U. S., at page 584 of 31 Sup. Ct. (55 L. Ed. 738), the court said:

"We agree with the construction contended for by the plaintiff in error, and insisted upon by the government, which has been allowed to be heard in this case. * * *"

In Brader v. James, 246 U. S. 95, 38 Sup. Ct. 286, 62 L. Ed. 591, it is said:

"As set forth in the opinion in the Tiger Case, the Act of April 26, 1906, was a comprehensive one, and intended to apply alike to all of the Five Civilized Tribes, and to make requirements as to conveyances by full-blood Indians and the full-blood heirs of Indians, which should take the place of former restrictions and limitations. The purpose was to substitute a new and uniform scheme controlling alienation in such cases, operating alike as to all the Civilized Tribes."

In Harris v. Bell, 254 U. S. 103, 41 Sup. Ct. 49, 65 L. Ed. ——, decided by the Supreme Court of the United States, on November 15, 1920, it is said:

"Section 19 of that act [April 26, 1906] materially revised the restrictions respecting lands of living allottees."

Also in the same opinion it is said:

"What is intended is to make sure that minor allottees receive the benefit of the restrictions prescribed in section 1 [Act of May 27, 1908], and not to impose others."

Whilst with the taking effect of the Act of April 26, 1906, restrictions were imposed, reimposed, or extended as to tribal lands where held by a full-blood member, whether by allotment or inheritance, for the period of 25 years from that date, the third proviso to said section is that all lands upon which restrictions are removed shall be subject to taxation, and *the other* lands shall be exempt from taxation as long as the title remains in the *original allottee*. No exemption from taxation is extended to the tribal lands held by inheritance by full-blood members. In cases of restricted tribal land held by full-blood members of the Five Civilized Tribes or heirs, same would not be exempt

from taxation unless under terms of existing treaties which remained unimpaired notwithstanding said Act of April 26, 1906.

Whilst section 1 of said Act of May 27, 1908, no portion of which relates to taxation, by revision in so far as it related to alienation had the effect of repealing said section 19 of the Act of April 26, 1906, yet said section 19 also in part relates to exemption from taxation.

[6] It cannot reasonably be contended that said Act of April 26, 1906, had the effect of extending the taxation exemptions to inherited allotted tribal lands; such exemption not theretofore existing, except as hereinbefore specifically pointed out (section 14, Cherokee Allotting Act; section 16, Supplemental Creek Agreement), as to inherited lands, held by full-blood members of said tribes for the third proviso to section 19 hereof, as a controlling limitation, stipulates that—

"All lands *upon which restrictions are removed shall be subject to taxation*, and the *other lands* shall be exempt from taxation as long as the title remains in the original allottee." (Italics mine.)

At the death of the original allottee the title of such tribal allotted lands passed to the heirs, and necessarily then and there became taxable with the exceptions heretofore noted (section 14, Cherokee Allotting Act; section 16, Supplemental Creek Treaty). While said Acts of May 27, 1908, and April 26, 1906, had the effect of extending to and continuing upon all inherited tribal allotted lands of the Five Civilized Tribes held by full-blood heirs restrictions against alienation (Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591; Talley v. Burgess, 246 U. S. 104, 38 Sup. Ct. 287, 62 L. Ed. 600), yet section 4 specifically provides:

"That all lands from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes," with the proviso which is a limitation "that *allotted lands* shall not be subjected or held liable to any form of personal claim, or demand against the *allottees* [italics mine] arising or existing prior to the removal of restrictions, other than contracts heretofore expressly permitted by law."

No intention is disclosed to extend the taxation exemptions as prescribed by the third proviso of said section 19 of the Act of April 26, 1906, so as to grant additional exemptions, the context, time, and conditions are against such construction. To my mind the deduction follows that it was not the intention of Congress to constitute this as an additional grant or exemption against taxation, by which exemption was extended to such inherited tribal allotted lands, but a declaration as to what allotted tribal lands are subject to taxation.

In Marcy v. Board of Commissioners of Seminole County et al., 45 Okl. 1, 144 Pac. 611, the Supreme Court of the state held that:

"The power to tax inherited Indian land is coincident with and dependent upon the removal of restrictions upon alienation; and, prior to the approval of conveyances of full-blood Indian heirs under the provisions of said act by the proper court, the power to tax said lands does not exist."

In the opinion it is said:

"From the language of the act 'that all land from which restrictions have been or shall be removed shall be subject to taxation,' it is clear the power of the state to tax the lands in question is coincident with and dependent upon the unrestricted right of the owner to sell the same. The power to tax, and right to convey, are granted by the same act, become effective upon the same condition and at one and the same time; the former cannot exist without the latter."

Section 2 of the Act of June 28, 1906 (34 Stat. 540), passed less than two weeks after that of the Enabling Act for the erection of the state of Oklahoma, in whose boundaries were included the Osage Nation, evidently in contemplation of the erection of the state, provides:

"Each member of said tribe shall be permitted to designate which of his three selections shall be a homestead, and his certificate of allotment and deed shall designate the same as a homestead, and the same shall be inalienable and nontaxable until otherwise provided by Act of Congress. The other two selections of each member, together with his share of the remaining lands allotted to the member, shall be known as *surplus land*, and shall be *inalienable for twenty-five years*, except as hereinafter provided. * * *

"That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this Act, except his homestead, which shall remain *inalienable* and *nontaxable* for a period of *twenty-five years*, or *during the life of the homestead allottee*, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: Provided, that upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States: Provided, that *the surplus lands shall be nontaxable for the period of three years from the approval of this Act, except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress.* * * *" (Italics mine.)

See Hudson v. Hopkins (Okl.) 183 Pac. 507.

The error in which the Supreme Court of Oklahoma was led in the Marcy Case was in not giving effect to the third proviso of section 19:

"That all lands upon which restrictions are removed shall be subject to taxation, and the *other* lands shall be exempt from taxation as long as the title remains in the *original* allottee." (Italics mine.)

[7] Under this proviso so far as effective all inherited tribal allotted lands then held by full-blood heirs of the Five Civilized Tribes as such were taxable. The said section 4 of the Act of May 27, 1908, "That all land from which restrictions have been or shall be removed shall be subject to taxation," with its proviso, must be read in the light of said third proviso to said section 19. It should not be construed so as to bring about a conflict with the exemption provision of section 6 of article 10 of the state Constitution, if as reasonable a construction can otherwise be reached. In addition said section 4 reasonably means that all lands from which restrictions have been or (now nontaxable and restricted against alienation) from which restrictions shall be removed

shall be subject to taxation. It is a far-fetched conclusion to say that section 4 by implication constitutes a grant of an exemption from taxation.

In Watkins v. Howard, County Treasurer (Okl.) 166 Pac. 706, the Supreme Court said:

"Following Marcy v. Board of County Commissioners, 45 Okl. 1, 144 Pac. 611, it is held, where the conveyance or deed of the interest of a full-blood Indian heir of the allottee of land allotted in the Choctaw Nation is invalid, unless approved by the Secretary of the Interior, or by the court having jurisdiction of the settlement of the estate of the deceased allottee, such interest in the land is not subject to taxation for any year prior to the execution and approval of the conveyance or deed by the heirs."

I am unable to give my assent to the soundness of these cases. To my mind they had the effect, not only of nullifying section 6 of article 10 of the Constitution of the state of Oklahoma, but also of giving an effect to the Acts of April 26, 1906, and May 27, 1908, not contemplated by the Congress of the United States.

The third proviso to said section 19, and section 4, Act May 27, 1908, rendering subject to taxation all such tribal lands upon which restrictions were removed in the Creek Nation has application when the act of alienation under such authorization for such removal of restriction was consummated by the conveyance. Fink v. Board of County Commissioners, 248 U. S. 399, 39 Sup. Ct. 128, 63 L. Ed. 324.

In the Seminole and Creek and Cherokee Nations it had the effect of extending such exemptions from taxation as to some of the lands to the life of the allottee. It is not essential here to determine whether the extension by said Act of Congress of April 26, 1906, carried to the members of said tribes the same continuing binding effect, and vested rights, as that granted to the members of the tribe by virtue of the treaties providing for allotment. Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941; Gleason v. Wood, 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 947; English v. Richardson, 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 949.

On April 26, 1906, the allotment of land to the Five Civilized Tribes had been practically completed. Section 2 of said Act of April 26, 1906 (34 Stat. 137, p. 137, c. 1876; Laws Relating to Five Civilized Tribes in Oklahoma, 496), provides:

"That for ninety days after approval hereof applications shall be received for enrollment of children who were minors living March fourth, nineteen hundred and six, whose parents have been enrolled as members of the Choctaw, Chickasaw, Cherokee, or Creek Tribes or have applications for enrollment pending at the approval hereof, and for the purpose of enrollment under this section illegitimate children shall take the status of the mother, and allotments shall be made to children so enrolled."

As said section is a part of the same act with said section 19, which contains the proviso, "that all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee," and said provisions of said sections 2 and 19 are not a part of any original or supplemental treaty with any nation of the Five Civilized

Tribes, the question may arise as to whether the exemption from taxation as to allotted lands to members of the Five Civilized Tribes as contained in the Original and Supplemental Agreements has the same application, to' allotments made by virtue of said section 2 to what is known as "new-borns." If said proviso to said section 19 relating to taxation and this authorization for allotments to such "new-borns" in section 2 are to be construed together as parts of the same act, and allotments are accepted under said act, are such "new-born" allotments bound by the provisions as to taxation as are contained in the third proviso to said section 19 of the Act of April 26, 1906, and section 4, Act of May 27, 1908?

Section 1, Act of May 27, 1908, fixed the status as to restrictions against alienation of lands allotted to members of the Five Civilized Tribes; such restrictions thereby remaining on such lands when held by a full-blood heir as such. Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591; Talley v. Burgess, 246 U. S. 104, 38 Sup. Ct. 287, 62 L. Ed. 600. Section 4 relates to allotted lands held by allottees. If not, why were the words "as though it were the property of other persons than allottees" used, and the restriction in the proviso thereto that "allotted lands shall not be subjected or held liable to any form of personal claim or demand *against the allottees* [italics mine] arising or existing prior to the removal of restrictions, other than contracts heretofore expressly permitted by law"? If this proviso was intended to relate to allotted lands *of allottees* and *also of full-blood heirs,* then the language used should have been "as though it were the property of other persons than allottees of the Five Civilized Tribes [or such heirs]," and the restriction in the proviso would read, "Shall not be subjected or held liable to any form of personal claim, or demand, against *the allottees or* [*such heirs*] arising or existing prior to the removal of restrictions other than contracts heretofore expressly permitted by law."

In the Choctaw and Chickasaw and Cherokee Nations heirs other than allottees and not of Indian blood could inherit such lands. In the Seminole Nation only enrolled citizen heirs could inherit, if such were in existence. Campbell v. Wadsworth, 248 U. S. 192, 39 Sup. Ct. 63, 63 L. Ed. 192. In the Creek Nation the enrolled Creek citizens and their Creek descendants, if such were in existence, inherited, to the exclusion of non-Indian heirs. Washington v. Miller, 235 U. S. 422, 35 Sup. Ct. 119, 59 L. Ed. 295; Jefferson v. Fink, 247 U. S. 288, 38 Sup. Ct. 516, 62 L. Ed. 1117; Parker v. Riley, 250 U. S. 66, 39 Sup. Ct. 405, 63 L. Ed. 847.

In the Creek and Cherokee Nations, on May 27, 1908, the period in which allotments other than homesteads were exempted from taxation by provisions in the treaties and allotting act had long prior thereto expired by limitation. If section 4 of Act of May 27, 1908, had the effect by implication, revision and substitution of repealing the taxation exemption as same existed when the third proviso to section 19, Act of April 26, 1906, became effective, then the surplus allotments of all Indians of the Seminole, Cherokee and Creek Tribes

having less than three-quarters of Indian blood with the passage of the act of May 27, 1908, then and there became taxable. The provision, "that all land from which restrictions have been or shall be removed shall be subject to taxation," relates to land held by allottees as such. This construction excludes the land here sought to be taxed from the language of said section 4, and the third proviso of said section 19, as to exemption from taxation.

[8] But if said section 4 should be held to apply to lands allotted to members of the Five Civilized Tribes, whether held by the allottees as such, or by the full-blood heirs of such allottees, still the lands in these cases sought to be taxed by the state would be excluded from the taxation exemption protection contained in said sections 4 and 19, for said lands are neither held as allotted or inherited land, and cannot reasonably be brought within its terms, so as to fall within the bounds of such tax exemption.

In United States v. Thurston County, Neb., et al., 143 Fed. at page 292, 74 C. C. A. 430, it is said:

"The proceeds of the sales of these lands [restricted Indian lands] have been lawfully substituted for the lands themselves by the trustee. The substitutes partake of the nature of the originals, and stand charged with the same trust. The lands and their proceeds, so long as they are held or controlled by the United States and the term of the trust has not expired, are alike instrumentalities employed by it in the lawful exercise of its powers of government to protect, support, and instruct the Indians, for whose benefit the complainant holds them, and they are not subject to taxation by any state or county."

In United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, where it was sought to tax property of Indians, title of which was in the United States, and which was held by it for the benefit of such Indians, it was held not to be subject to state and county taxes. In United States v. Pearson (D. C.) 231 Fed. 270, it was held by Elliott, District Judge:

"Personal property issued by the government to Sioux Indians, who live on separate allotments, but maintain their tribal relations, consisting of horses, cattle, and their increase, and farm implements and other property acquired by exchange of such property or otherwise, which is derived directly or indirectly from the government and is used by the Indians on their farms, is not subject to taxation by state authorities. Such property is not absolute property of the Indians, but is held in trust for their benefit by the government for the purpose of carrying out its policy of helping them to be self-sustaining. as is evidenced by Act July 4, 1884, c. 180, 23 Stat. 94 (Comp. St. 1913, § 4121), and Act March 2, 1889, c. 405, § 17, 25 Stat. 895, which restrict the sale of cattle issued, and their increase, by the Indians to members of their own tribe."

[9] Further, in view of the provision, "No taxes shall be imposed by the state on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use" (section 3, art. 1, Const. Okl.; section 3, Enabling Act), and that "all property * * * exempt by * * * treaty stipulations, *existing* [italics mine] between the Indians and the United States government, or by federal laws, *during the force and effect* [italics mine] of such treaties or federal laws" (section 6, art. 10, Const. Okl.), shall be exempt

from taxation, it cannot be reasonably determined that it was contemplated by the Congress that such taxable and unrestricted lands when so acquired should be such a federal instrumentality or agency as to be without the taxing power of the state. In Jones v. Whitlow (Okl.) 175 Pac. 753, it was held that—

"Lands, theretofore taxable, purchased from their private owners, with royalties accruing to a full-blood Creek Indian from her restricted allotment, are not exempted from state taxation by a clause in the deed from the grantor making the lands inalienable without the consent of the Secretary of the Interior."

Having reached the foregoing conclusions, it is not essential to pass on the contention that the exemption as claimed by plaintiff was not within the powers of Congress as limited by article 4, § 3, and amendments 9 and 10 of the federal Constitution. Lane County v. Oregon, 74 U. S. (7 Wall.) 76, 19 L. Ed. 101.

A judgment will be entered in favor of defendant in each case.